# United States Court of Appeals
## For the First Circuit

Nos. 07-1764, 07-1765

KEVIN W. TOBIN,

Plaintiff-Appellee/Cross-Appellant,

v.

LIBERTY MUTUAL INSURANCE COMPANY,

Defendant-Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Lipez and Howard, Circuit Judges.

Lisa J. Damon, with whom Susan W. Gelwick and Seyfarth Shaw LLP were on brief, for defendant-appellant.
Frank J. Frisoli for plaintiff-appellee.

January 23, 2009

**LIPEZ**, <u>Circuit Judge</u>. A jury awarded plaintiff Kevin Tobin more than $1.3 million in damages based on the failure of his employer, Liberty Mutual Insurance Company, to accommodate his disability as required by federal and state law. The district court subsequently ordered a $90,000 remittitur, but rejected Liberty Mutual's contention that the evidence was insufficient to support either liability or the remaining damages award. The court also rebuffed the company's argument that the statute of limitations had run on Tobin's claims.

On appeal, Liberty Mutual renews its sufficiency and statute-of-limitations challenges and also argues that the district court erred in calculating prejudgment interest. Tobin cross-appeals, claiming that the district court erred in refusing to instruct the jury on punitive damages and denying attorney's fees pending final judgment. After careful review of the record, we affirm.

**I.**

**A. Prior Proceedings**

Tobin was terminated by Liberty Mutual in January 2001 after working for the company for nearly thirty-seven years. For most of that time, he served as a sales representative responsible for selling insurance and assisting customers with needs related to their insurance policies. He had been under the care of a

psychiatrist since 1976, was diagnosed with bipolar disorder in 1992, and had taken short-term disability leaves in 1997 and 1998.

Following his termination, Tobin filed this action against the company alleging, inter alia, disability discrimination, including a failure to accommodate, pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B ("Chapter 151B").[1] Liberty Mutual defended against the claims by asserting that Tobin did receive certain accommodations and was not entitled to others, and that he was fired because of poor job performance.

In its initial consideration of the case, the district court granted summary judgment for Liberty Mutual on all claims. Tobin then appealed. See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100 (1st Cir. 2005). We agreed with the district court that Tobin had failed to adduce evidence showing that the company's proffered reason for his discharge was pretextual. We noted that Liberty Mutual had "provided a full and well-documented account of Tobin's 'longstanding performance deficiencies,'" id. at 105-06, which included failing to meet minimum quotas and standards and not showing up for meetings with supervisors. We therefore held that

---

[1] He also alleged various other causes of action, including age discrimination and wrongful termination, but those claims were abandoned early in the litigation.

-3-

the district court correctly granted summary judgment on Tobin's pretext claim.  Id. at 106.

We reached the contrary conclusion with respect to the "reasonable accommodation" claim.  Under both the ADA and Chapter 151B, employers are required to assist an otherwise qualified employee who has a disability by providing reasonable accommodations that would enable him to perform his job.  42 U.S.C. § 12112(b)(5)(A);[2] Mass. Gen. Laws ch. 151B, § 4(16).[3]  However, in making such accommodations, an employer is not obliged to alter an employee's essential job functions.  Tobin, 443 F.3d at 107.  After reviewing the evidence offered on Tobin's accommodation claim, we discerned a triable issue of fact as to whether Tobin would be able

---

[2] The ADA's definition of discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the [entity's] business."  42 U.S.C. § 12112(b)(5)(A).

[3] We previously have noted that Chapter 151B "tracks the ADA in virtually all respects."  Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 20 n.5 (1st Cir. 2002); see also Mulloy v. Achushnet Co., 460 F.3d 141, 154 (1st Cir. 2006) ("'[T]he Supreme Judicial Court of Massachusetts has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law.'" (quoting Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 33 n.2 (1st Cir. 2000))); Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 772 N.E.2d 1054, 1062 n.6 (Mass. 2002) ("We look to the Federal cases decided under the ADA as a guide to the interpretation of G.L. c. 151B."). The only difference of significance here is the length of the statutes of limitation.  Other than in our discussion of that issue, infra Section II, we will focus on the ADA and federal case law.  See Tobin, 433 F.3d at 104 n.2.

to perform the essential functions of his job if provided the accommodations he had requested. We therefore remanded that claim for further proceedings.[4] The district court held an eleven-day jury trial that produced the verdict for Tobin that Liberty Mutual challenges in this appeal.

## B. Tobin's Work Problems and Requests for Accommodation

### 1. History of Deteriorating Performance

Tobin's bipolar disorder affected his ability to do his job in a variety of ways. His focus and concentration were impaired, and he had difficulty prioritizing and completing work. Most tasks took him longer than in the past to accomplish, and he had difficulty transitioning from one task to the next. Multiple witnesses testified about the jumble of papers that typically covered his desk. Stress tended to worsen his problems in managing his workload. Tobin's limitations made it difficult for him to find prospective customers in sufficient numbers to meet the company's sales goals. Although Tobin had accumulated a large "book" of business over the years – insurance policies that renewed

---

[4] In our earlier decision, we also discussed Tobin's assertion that Liberty Mutual failed to engage in an "interactive process" with him to identify appropriate accommodations, 433 F.3d at 108-09, although we recognized that that claim was "a subsidiary theory of his 'reasonable accommodation' argument." Tobin, 433 F.3d at 108 n.7. We held that the district court properly found that Liberty Mutual had satisfied its obligation to engage in an interactive process, and had, in fact, provided Tobin with accommodations other than the ones at issue here. Id. at 109. We therefore do not consider the "interactive process" aspect of Tobin's accommodations claim in this opinion.

and continued to bring in significant profits in annual premiums – by the early 1990s he began to routinely fall short of annual quotas for new policy sales.

Tobin's supervisor in the mid-1990s, Mike Robin, first took action against Tobin in 1996, giving him a written warning stating that failure to meet his sales requirements would lead to probation and possible termination. Although Liberty Mutual waived that probationary period because Tobin's wife was ill, Robin implemented a nine-week warning period on November 21, 1997, requiring Tobin to improve his performance by increasing sales and participating in sales initiatives.

Two weeks into that period, Tobin took his first short-term disability leave of absence, which extended from December 1997 until June 1998. He took a second disability leave from September 1998 until January 1999. Each time he returned to work, he was placed on a reduced schedule for a month before resuming full-time duties. During his re-entry periods, he received additional training and met with his supervisor regularly to review his performance and discuss ways that he could increase his sales. After both leaves, when he returned to full-time work, the warning period that had been suspended when he took his first leave was reinstated.

When Tobin returned from the second leave in January 1999, Liberty Mutual hired a nurse to assist him in transitioning back

into full-time sales work. Although he managed to sell enough policies in February to avoid a threatened four-week probation, his then-supervisor, Manina Schwitters, stated in a letter dated March 8, 1999, that she would monitor Tobin's sales results in four-week increments for the rest of the year. He failed to satisfy his quota in March (selling only ten policies instead of twenty-four), but successfully completed the resulting probation by selling the required thirty policies. His performance continued to deteriorate, however; he was given another warning period in October 2000, and then placed on probation from November 27, 2000 through January 5, 2001. He failed to sell the required thirty policies during that period and was terminated on January 10, 2001 for consistent poor performance.

2. Requests for Accommodation

It is undisputed that Tobin repeatedly asked Liberty Mutual to help him achieve his performance goals by giving him two forms of assistance: (1) providing him with increased support staff to respond to customer service calls, which would allow him to devote more time to new sales, and (2) assigning him to manage a "Mass Marketing" account. Mass Marketing ("MM") accounts are group insurance programs offered to businesses and other institutions in which employees or members are able to purchase insurance policies at a discount. Both the insurance company as a whole and individual sales representatives highly value MM accounts because

they offer access to a large volume of potential clients in a single location. It is not uncommon for more than a dozen individuals whose employer has newly signed up for an MM account to meet with a sales representative at their workplace in back-to-back time slots on a single day.

Tobin sought to prove at trial that he would have been able to overcome the difficulties caused by his disability, and could have met his quotas, if Liberty Mutual had given him adequate customer service support and assigned him to an MM account. He claimed that these accommodations would have compensated for the disadvantages caused by his disability without altering the essential functions of his job. He elicited testimony indicating that he had difficulty finding prospective clients, but that he had good closing skills once he was engaged in a sales call. He also suggested that the time he had available to prospect for new clients was disproportionately consumed by his need to respond to service calls from his large number of long-time clients.

In response, Liberty Mutual offered evidence that Tobin was provided with the support staff he needed and that he was not qualified to handle an MM account. Liberty Mutual argued that MM accounts were distributed solely on the basis of merit to sales representatives who were actively pursuing other such accounts and who otherwise were meeting their sales quotas. In addition, company representatives testified that managing an MM account

required strong organizational and time-management skills because of the sales representative's need to move from task to task when meeting in rapid succession with many individuals. Such circumstances also made MM sales encounters particularly stressful. In effect, the company attempted to show that Tobin could not have done the job even with the accommodation of an MM assignment and Liberty Mutual was therefore not obliged to make such an accommodation.

Liberty Mutual witnesses also testified about the service support that Tobin received. In addition to service representatives specifically assigned to Tobin, a pool of representatives was available to him – and other sales agents – to handle service calls when his own representatives were busy. Liberty Mutual sought to show that Tobin did not effectively take advantage of this support, choosing to handle too many service calls himself. The company also elicited testimony that the need for additional service help was a common problem among sales representatives because of the limited number of service representatives at the company.

## C. The Verdict and Post-Trial Proceedings

In returning their verdict in favor of Tobin, the jurors responded to a series of special questions posed by the district court. They specifically found that the accommodations Tobin requested were reasonable, that providing such accommodations would

not have changed the essential functions of his job, and that one or both of the accommodations would have enabled him to perform his job despite his disability.  In response to the court's special question on damages, the jury awarded Tobin more than $800,000 for economic loss and $500,000 for emotional distress.[5]

Liberty Mutual filed a post-trial motion pursuant to Federal Rules of Civil Procedure 50 and 59(a), raising numerous arguments in support of its request for judgment as a matter of law and, in the alternative, a new trial.  Among other contentions, the company argued that Tobin had failed to prove either that he was disabled within the meaning of the applicable federal and state discrimination laws or that the proposed accommodations were reasonable and would have enabled him to perform the essential functions of his job.  Liberty Mutual also asserted that Tobin's claims were untimely because he had not made a specific request for the accommodations within the statutory limitations periods.  In addition, the company challenged the damages award on multiple grounds, including that the recovery for emotional distress was unsupported by the record and was excessive.

Following a hearing, the district court largely rejected Liberty Mutual's contentions.  Although it acknowledged that the jury was "very generous and indulgent" and that "the evidence is

---

[5] The economic damages were allocated as follows: $439,315 for unpaid salary, $264,951 for additional pension, and $151,713 for additional thrift investment contributions.

thin on certain essential points," the court concluded that the judgment was supportable in light of the deference owed to jury fact-finding. In particular, the court found that the evidence was "sufficient to support a reasonable inference" that Tobin made a timely request for the accommodations, and it also ruled that "[t]here was certainly evidence from which a jury could reasonably infer that providing Tobin with his requested accommodations would have helped his performance as a sales representative." The court further found "no adequate evidence that providing Tobin with either of his proposed accommodations, although perhaps not consistent with customary practice, would have placed an unreasonable burden on Liberty Mutual."

As for Liberty Mutual's challenges to the damages award, the court found merit only in the company's claim that Tobin's compensation for lost salary should have been reduced by the amount of his disability benefits. Hence the court conditioned its denial of Liberty Mutual's request for a new trial on Tobin's acceptance of a remittitur in the amount of $90,000. Tobin subsequently accepted that reduction.

In this appeal, Liberty Mutual raises five objections to the district court's rulings: (1) Tobin's claims should have been deemed time-barred because he failed to make a specific request for accommodations during the limitations period, (2) the evidence did not support the jury's finding that assignment of an MM account was

a reasonable accommodation, (3) the jury's award of front and back pay was erroneous, (4) the district court erred in refusing to grant a remittitur of the emotional distress damages, and (5) the court erred in its calculation of prejudgment interest. In a cross-appeal, Tobin claims that the district court erred in refusing to instruct the jury on punitive damages and declining to make an award of attorney's fees pending final resolution of the case.

We address each contention in turn, beginning with the statute of limitations.

## II.

An employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007), and the request must be "sufficiently direct and specific" to give the employer notice of the needed accommodation, Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (citation omitted); see also Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 23 (1st Cir. 2004). If the request is refused, "the refusal is a discrete discriminatory act triggering the statutory limitations period." Ocean Spray Cranberries, Inc. v. MCAD, 441 Mass. 632, 808 N.E.2d 257, 268 (Mass. 2004); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (noting that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or

-12-

refusal to hire" are separate, actionable incidents of discrimination); Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 188 (1st Cir. 2003) (citing Morgan and holding that transfer was a time-barred discrete act); Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134-35 (2d Cir. 2003) (holding that denial of an employee's proposed accommodation for religious practices is a "single completed action when taken" and, as such, is a "discrete act" that starts the statutory clock).

Tobin filed his administrative claims with the Massachusetts Commission Against Discrimination (under Chapter 151B) and the Equal Employment Opportunity Commission (under the ADA) on July 2, 2001. Under the ADA, which requires that such claims be filed within 300 days of the actionable conduct, see 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1), Tobin needed to prove that Liberty Mutual committed a discriminatory act on or after September 4, 2000. For Chapter 151B, which at the relevant time had a six-month limitations period,[6] such an act needed to occur on or after January 2, 2001.

Liberty Mutual takes two different paths in challenging the timeliness of Tobin's failure-to-accommodate claim. First, it argues that there is no evidence in the record of a "direct and

---

[6] The Massachusetts legislature in 2002 amended Chapter 151B § 5 to extend the limitations period from six months to 300 days. It is undisputed that the earlier version of the statute applies here.

-13-

specific" request by Tobin for MM assignments or additional customer service assistance during the applicable limitations periods. Alternatively, Liberty Mutual argues that, even if Tobin made a specific request for the accommodations during the relevant times, his discrimination claim would be time-barred because the limitations periods started running years earlier, when Tobin should have realized that the accommodations would not be forthcoming. Because it is potentially dispositive, we turn first to the latter contention.

## A.  When Did the Statutory Clocks Start to Run?

Liberty Mutual argues that the statutes of limitations began to run on Tobin's reasonable accommodation claim when the company first rejected his requests for MM accounts and additional support staff. It is undisputed that those initial denials occurred no later than 1997, and the company asserts that no rationale exists for extending the limitations period beyond the initial statutory term. Hence, Liberty Mutual maintains that Tobin's reasonable accommodation claim had expired by the time he filed his administrative complaint in July 2001. In response, Tobin argues that his claim was timely both under the "continuing violation" doctrine and because the company denied his renewed requests for accommodation within the statutory periods. Although we agree that Tobin's claim may be timely even though his accommodation requests were first denied four years before he filed his administrative

complaint, his reliance on the continuing violation doctrine is misplaced.

1.  The Continuing Violation Doctrine

A party alleging employment discrimination may, in appropriate circumstances, file suit based on events that fall outside the applicable statutes of limitation.  Morgan, 536 U.S. at 116-117; Ocean Spray Cranberries, 808 N.E.2d at 266-67.  Under the "continuing violation" doctrine, a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period.  However, it is now well established that the doctrine does not apply to "discrete acts" of alleged discrimination that occur on a "particular day," but only to discriminatory conduct that takes place "over a series of days or perhaps years."  Morgan, 536 U.S. at 115; see also Rivera, 331 F.3d at 188 (noting Morgan's holding that "a discrete discriminatory act transpires only at the time it takes place, even if it was related to acts that were timely filed"); Cherosky v. Henderson, 330 F.3d 1243, 1246 (9th Cir. 2003) ("Morgan makes clear that claims based on discrete acts are only timely where such acts occurred within the limitations period . . . .").[7]

_____

[7] Morgan discussed the continuing violation doctrine in the context of a Title VII claim, but the discussion is equally applicable in the ADA context. See Mayers v. Laborers' Health & Safety Fund of N. A., 478 F.3d 364, 368 (D.C. Cir. 2007) (per curiam) (noting that "[t]he ADA incorporates the procedural

The classic example of a continuing violation is a hostile work environment, which "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). The continuing violation doctrine applies in that setting because hostile work environment claims by "[t]heir very nature involve[] repeated conduct," and "a single act of harassment may not be actionable on its own." Id. at 115; see also Ledbetter v. The Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2175 (2007) ("[A] hostile work environment claim 'cannot be said to occur on any particular day'" because "the actionable wrong is the environment, not the individual acts that, taken together, create the environment." (quoting Morgan, 536 U.S. at 115-116)). Thus, "component acts" of a hostile work environment claim that occur outside the filing period may be considered for purposes of determining liability. Morgan, 536 U.S. at 117.

By contrast, the denial of a disabled employee's request for accommodation starts the clock running on the day it occurs. As we have noted, such a denial is a discrete discriminatory act that, like a termination, a refusal to transfer, or a failure to promote,

---

provisions of Title VII" (citing 42 U.S.C. § 12117)); Stepney v. Naperville Sch. Dist. 203, 392 F.3d 236, 239 (7th Cir. 2004) ("[T]he ADA's enforcement provision expressly incorporates § 2000e-5 of Title VII . . . ."); Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999) (holding that Congress "engrafted onto the ADA the full panoply of 'procedures' described in section 2000e of Title VII").

does not require repeated conduct to establish an actionable claim. Consequently, the continuing violation doctrine does not apply to this case, and the timeliness of Tobin's claim turns solely on whether an actionable denial of his request for accommodations occurred during the limitations periods.[8]

2. The Timing of Liberty Mutual's Denial of Tobin's Request for Reasonable Accommodation

Liberty Mutual asserts that Tobin's claim was untimely because the statutory periods began to run when the company first refused to give him MM accounts. Citing numerous cases, it argues that a plaintiff may not delay or restart the limitations period by making repeated requests for the same accommodation. We reject that understanding of the law.

It is settled that an employee may not extend or circumvent the limitations period by requesting modification or reversal of an employer's prior action. Delaware State Coll. v. Ricks, 449 U.S. 250, 261 n.15 (1980) ("Mere requests to reconsider . . . cannot extend the limitations periods applicable to the civil rights laws."). However, it is apparent from the Supreme Court's discussions in Morgan and Ledbetter that an employee who renews his request for particular accommodations may bring suit based on a new

---

[8] The court in Ocean Spray appeared to contemplate a role for the "continuing violation" analysis under Chapter 151B even in cases involving discrete acts. See Ocean Spray, 808 N.E.2d at 267 n.16. We do not delve into that issue as it is unnecessary to resolve the case before us.

"discrete act" of discrimination if the employer again denies his request. In Morgan, the Court explicitly stated that "[t]he existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." 536 U.S. at 113; see also Ledbetter, 127 S. Ct. at 2174 ("[A] freestanding violation may always be charged within its own charging period regardless of its connection to other violations.").

Liberty Mutual's argument misapprehends the difference between instances in which the employer commits multiple acts, each of which is independently discriminatory, and those circumstances in which an employee attempts to rely on either the ongoing effects of the employer's single discriminatory act or the employee's efforts to obtain reversal of that singular act of alleged discrimination. Three cases cited by Liberty Mutual help to illuminate that distinction.

In Cherosky, 330 F.3d at 1244, the Ninth Circuit addressed the accommodation claims of four postal employees whose requests to use respirators on the job had been denied. The employees, who brought suit four years later, acknowledged that their claims were based on conduct – i.e., the denial – that occurred outside the applicable limitations period. Id. at 1245-46. They argued that the denial

date was not determinative because of the ongoing effect of the Postal Service's allegedly discriminatory no-respirator policy. Id. at 1246. Relying on Morgan, the court rejected their attempt to extend the limitations period, concluding that "the alleged wrong here occurred and accrued when the policy was invoked to deny an individual employee's request." Id. at 1247. Significantly, however, the court observed that the employees were not without a remedy because "if a new request [for respirators] results in a denial, the time period begins to run anew." Id. at 1248.

The Second Circuit in Elmenayer, 318 F.3d at 135, similarly drew a distinction between the continuing impact of an employer's rejection of an employee's requested accommodation and the "discrete act" that started the running of the statute of limitations. The employee in that case, a truck driver, had requested a schedule change as an accommodation of his religious observance, but his employer denied the proposal as inconsistent with company rules. Id. at 132.

The court, also relying on Morgan, held that the statute was triggered by the original denial of the employee's request, even though "the effect of the employer's rejection continues to be felt by the employee for as long as he remains employed." Id. at 135. The court emphasized that, once the employer rejected the employee's proposed accommodation, "it took no further action concerning his interest in attending prayer sessions." Id.

-19-

Referring to Morgan's holding that the timeliness of discrete acts such as transfers or promotions turns on the day the decisions are made, the Second Circuit observed that the continued enforcement of scheduling rules "is no different, for time-bar purposes, than an employer's continuation of an employee in a position from which he had sought promotion or transfer." Id. However, like the court in Cherosky, the Second Circuit recognized that different considerations would exist "if the employee renew[ed] the request for an accommodation" within the limitations period. Id. The court declined to decide the effect of those different circumstances.

In both Cherosky and Elmenayer, the employers committed one allegedly discriminatory act that had continuous impact on individuals who did not make renewed proposals for accommodation during the applicable limitations periods. In De Leon Otero v. Rubero, 820 F.2d 18, 19 (1st Cir. 1987), we confronted the situation of an employee who alleged a discriminatory discharge and sought to bring his claim within the statute of limitations based on his subsequent efforts to secure reversal of the original decision. We observed that the employer's refusal to rehire the plaintiff after his termination was "not a separate act of discrimination, but rather a consequence of his initial demotion." Id. at 20; see also Martin v. Sw. Va. Gas Co., 135 F.3d 307, 310 (4th Cir. 1998) ("An employer's refusal to undo a discriminatory

-20-

decision is not a fresh act of discrimination.")(citation omitted); Zdziech v. DaimlerChrysler Corp., 114 Fed. App'x 469, 471 (3d Cir. 2004) ("The repeated refusal of an employer to reinstate an employee to a formerly held position . . . does not give rise to a new claim of discrimination."); Long v. Howard Univ., 512 F. Supp. 2d 1, 17 (D.D.C. 2007) (noting the distinction between "new discrete acts of discrimination within the limitations period, and requests for reconsideration of a previously denied request, which may not revive a time-barred claim").

Tobin's allegations here are materially different from those in the cases we have described. He alleges that Liberty Mutual consistently denied his repeated requests for accommodations and asserts that each denial constituted a discrete act that was the basis for a separate claim of discrimination and carried with it a new statute of limitations. The correctness of his view is the inevitable teaching of the Supreme Court's cases in this area. In Ledbetter, the Court emphasized that "[a] new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from . . . past discrimination." 127 S. Ct. at 2169. However, "if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed." Id. Indeed, in the context of disability discrimination, any other approach would fail to take

-21-

into account the possibility of changes in either the employee's condition or the workplace environment that could warrant a different response from the employer to renewed requests for accommodation.

Thus, the question we must answer is whether any of Tobin's requests for accommodation occurred during the applicable statutory periods. Before turning to that question, however, we briefly address Tobin's argument that the statute of limitations never began to run on his accommodation requests because Liberty Mutual never outright told him he could not have MM accounts. We deem Liberty Mutual's response an unequivocal denial of Tobin's request for accommodation. He was told, repeatedly, that he would not be given such accounts because he did not qualify for them.[9] In other words, Liberty Mutual unconditionally denied Tobin's request that he be given such accounts as an accommodation and left no doubt that he would have to meet the same eligibility criteria as every other employee. The statute thus ran on any requests made and denied on that basis outside of the applicable statutory periods.[10]

---

[9] Tobin testified that he asked Schwitters for MM assigmments "[o]ver and over again," and that "[s]he said I didn't qualify."

[10] In so concluding, we effectively agree with Liberty Mutual's contention that claims based on Tobin's requests for accommodation prior to the limitations periods were time-barred because, when the company rejected those early requests, Tobin "knew or reasonably should have been aware that the employer was unlikely to afford him a reasonable accommodation." Ocean Spray, 808 N.E.2d at 268 (holding that the statutory period begins to run even in the face of "equivocal action or inaction" by the employer if the employee

**B. Did Tobin Make a Timely and Specific Request for Accommodation?**

The pivotal question in assessing the statute of limitations issue is whether Tobin made a specific request for accommodation that was denied during the statutory periods – in other words, on or after September 4, 2000 for purposes of the ADA, and on or after January 2, 2001 for purposes of Chapter 151B. Liberty Mutual asserts that the record contains no evidence of such a request. Tobin responds that the statute of limitations defense is waived because Liberty Mutual did not request an instruction asking the jury to make an explicit finding on whether a request and denial occurred during either of the two limitations periods.

The timing of Tobin's requests for accommodation is an issue of fact the jury logically should have been asked to decide. However, the district court declined to reject the limitations defense based on Liberty Mutual's failure to request a more specific jury question. It noted that Liberty Mutual had raised the statute of limitations issue repeatedly, including in its pre-trial memorandum and in its motions for judgment following the presentation of evidence. The court thus went on to consider whether the jury had before it sufficient evidence to find that Tobin asked Liberty Mutual for an accommodation during the

had adequate notice that his request would not be accommodated).

-23-

applicable statutory periods. We see no reason to disturb the district court's decision to proceed in this manner.

The court concluded that the evidence was "thin," but "sufficient to support a reasonable inference that Tobin's requests for accommodation were made within the statute of limitations period for Chapter 151B and consequently the ADA as well." We agree with that assessment of the record. See Parker v. Gerrish, 547 F.3d 1, 8 (1st Cir. 2008) ("In reviewing decisions on motions for judgment as a matter of law, we review questions of law de novo, but review the sufficiency of the evidence drawing all reasonable inferences in favor of the prevailing party.") (citation and internal quotation marks omitted); Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007) ("[W]e will set aside the jury verdict only if the evidence, viewed in the light most favorable to [plaintiff], points so strongly and overwhelmingly in favor of [the defendants], that a reasonable person could not have arrived at [this] verdict.") (citation and internal quotation marks omitted; second and third alterations in original).

The court described the evidence as follows:

> The evidence of Tobin's requests for accommodations between September 2, 2000 and January 2, 2001 and between January 2, 2001 and January 10, 2001 was more generalized than specific but it built upon earlier specific evidence. Tobin testified that "I continually made the same two requests" for accommodations – additional service support and Mass Marketing – during his weekly meetings with his supervisor Nina Schwitters from

-24-

February 1999 until his discharge in January 2001. While thin, this evidence, when coupled with evidence of meetings between Schwitters and Tobin, is sufficient . . . .

As the district court acknowledged, there was no explicit evidence that Tobin requested accommodation on particular days within the statutory periods. But the evidence that he met with Schwitters at least weekly[11] and that he asked for MM assignments "[o]ver and over again" allows the inference that he was continuing to do so in the critical meetings toward the end of his tenure with Liberty Mutual.

That inference is reinforced by notes that Schwitters made during a meeting with Tobin on January 2, 2001 indicating that Tobin complained about not being on a "level playing field" with other representatives.[12] Tobin later used the "level playing field" language in testifying that the disadvantage of his disability could have been overcome if he had received the requested accommodations.[13] Given Tobin's testimony that he repeatedly asked

---

[11] He testified that he met with her "at least once a week, possibly twice a week. Because sometimes I would meet her individually and sometimes there would be a meeting. And then after the meeting, she would ask me to stay after the meeting."

[12] The handwritten notes include the phrase "Not on level playing field." At trial, Schwitters was asked if there was discussion with Tobin "about whether he was on a level playing field with the other reps." She responded: "I think that was his comment to me."

[13] The relevant testimony was part of the following exchange:

Q. But if you did fall on your face, sir, to use your words, there would be harm to Liberty Mutual, wouldn't there? Isn't that right?

for the same accommodations in his meetings with Schwitters, it is reasonable to infer that his reference to the level playing field on January 2 was accompanied by another such request. Moreover, Schwitters' notes from the meeting include the notation "No MM accts" – confirming that assignment of the accounts was discussed. We are thus satisfied that the evidence in the record, though circumstantial, was sufficient to support a finding that Tobin followed his routine practice at the January 2 meeting and requested the accommodation of MM accounts. See Caldwell Tanks, Inc. v. Haley & Ward, Inc., 471 F.3d 210, 214 (1st Cir. 2006) ("A district court may grant a Rule 50 motion only when 'after examining the evidence and all reasonable inferences therefrom "in the light most favorable to the nonmovant," it determines that "the evidence could lead a reasonable person to only one conclusion," favorable to the movant.'") (citations omitted); Fed. R. Civ. P. 50(a)(1).

The court's use of the sufficiency standard in evaluating the evidence reflected an assumption that the jury had found, albeit implicitly, that Tobin had requested the accommodations during the

---

A. No. What I meant by falling on my face, if you gave me a Mass Merchandising, gave me the help I asked, say for a 90-day period and I didn't get the numbers, then I would probably think about retiring. Okay. But if you gave me the Mass Merchandising and you gave me the help, I knew that I would be successful. I can't guarantee that, but I know I'd be on a level playing field.

statutory periods.  The court's assumption appeared to stem from the parties' discussion of the statute of limitations in connection with Special Verdict Question 4.  That question asked if Tobin had established by a fair preponderance of the evidence that, with the requested accommodations, he would have been able to perform the essential functions of the job of sales representative.  The court added the statute of limitations dates to Question 4 over Tobin's objection but with Liberty Mutual's acquiescence, and the jury consequently was required to find that Tobin would have been able to do the job "[b]etween September 4, 2000 and January 10, 2001," and "[b]etween January 2, 2001 and January 10, 2001."[14]  At the charging conference, the court observed that this addition "solve[d] the statute of limitations[] issue."

In a footnote in its brief, Liberty Mutual asserts that the court applied the wrong standard because the jury never made an express finding on whether Tobin requested an accommodation during the limitations periods.  The company claims that the court should have weighed the evidence itself instead of examining whether the evidence was sufficient to support a jury finding.  In so arguing, Liberty Mutual apparently relies on Federal Rule of Civil Procedure 49(a), which allows a court to make a finding based on its own

---

[14] January 10 was the date of Tobin's termination.  The question thus asked the jury to determine if Tobin would have been able to do the job during the statute of limitations periods and before his termination.

review of the evidence when special verdict questions omit a material issue of fact that should have been resolved by the jury.[15] See Anderson v. Cryovac, Inc., 862 F.2d 910, 915-916 (1st Cir. 1988).

Although we have reservations about whether the jury would have understood Question 4 to incorporate the pertinent statute of limitations question, Liberty Mutual has only itself to blame for that ambiguity. It did not propose a special verdict question explicitly asking the jury to determine whether a request was made within the statutory periods. In these circumstances, we again have no reason to fault the district court's conclusion that Question 4 "solve[d] the statute of limitations[] issue." See id. at 918 (noting that parties "ought not to be allowed to base an appeal on the ambiguities and omissions that were the natural consequence of their strategy").

---

[15] Rule 49 addresses procedures related to special verdicts and to general verdicts with written questions. Section (a)(3) of the Rule, applicable to special verdicts, provides in relevant part:

> A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. If the party does not demand submission, the court may make a finding on the issue. If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.

Hence we conclude that the district court properly found that Tobin's claims under both the ADA and Chapter 151B were timely. We therefore turn to the merits of those claims.

### III.

The ADA "prohibits an employer from discriminating against an 'individual with a disability' who, with 'reasonable accommodation,' can perform the essential functions of the job." U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 393 (2002) (quoting 42 U.S.C. § 12112(a) and (b)). It is the plaintiff's burden to show availability of "reasonable accommodations," and the defendant then has the opportunity to "demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); see also Freadman, 484 F.3d at 103; Reed, 244 F.3d at 258-59.

More specifically, the plaintiff's burden under the ADA is "to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." Reed, 244 F.3d at 259. If the plaintiff successfully carries this burden, "the defendant then has the opportunity to show that the proposed accommodation is not as

feasible as it appears but rather that there are further costs to be considered."  Id.[16]

In our earlier decision in this case, we vacated the grant of summary judgment on Tobin's "failure to accommodate" claim because we perceived "a triable issue of fact as to whether access to MM accounts would have altered the nature of Tobin's job requirements and the essential functions of his employment."  433 F.3d at 107. On remand, a jury found that assigning Tobin to an MM account and providing additional service support would have been reasonable accommodations enabling him to perform his job without changing its essential functions.[17]  The district court refused to disturb that judgment.

---

[16] We have recognized that the plaintiff's burden to show reasonableness overlaps with the defendant's burden to prove undue hardship because "[a] reasonable request for an accommodation must in some way consider the difficulty or expense imposed on the one doing the accommodating."  Reed, 244 F.3d at 259.

> Indeed, where the costs of an accommodation are relatively obvious – where they really are what they appear to be on the face of things – plaintiff's burden and defendant's burden may in application be quite similar, even to the extent of being mirror images. Where the burdens will significantly differ is when the costs of an accommodation are not evident on the face of things, but rather are better known to the employer.

Id. at 260.

[17] Although the jury made findings with respect to both MM accounts and service support, Liberty Mutual focuses on the MM assignments and we therefore do likewise in our discussion.

-30-

On appeal, Liberty Mutual argues that the district court erred in denying its motion for judgment as a matter of law, renewing its contention that the evidence Tobin presented was insufficient to prove that assigning him Mass Marketing accounts would have been a "reasonable" accommodation. We review de novo the district court's denial of Liberty Mutual's motion, and will "set aside the jury verdict only if the evidence, viewed in the light most favorable to [Tobin], points so strongly and overwhelmingly in favor of [Liberty Mutual], that a reasonable person could not have arrived at [this] verdict," Dixon, 504 F.3d at 80-81 (citation and internal quotation marks omitted) (final substitution in original).

Liberty Mutual argues that Tobin's request for MM accounts was unreasonable because he was unqualified for such an assignment in two respects: first, his poor sales performance made him ineligible for MM assignments, which were awarded as perks to the highest performing agents, and, second, his disability made him incapable of handling the stressful, fast-paced MM sales process.

A.   **Eligibility for MM Accounts**

We have little difficulty in dismissing the first rationale. Ample evidence supports the conclusion that Tobin's illness significantly impaired his ability to meet his sales goals. Indeed, he requested an MM assignment in the belief that the logistical convenience of such accounts would offset the deficits

-31-

in his performance that were attributable to his disability.[18]  A request for an accommodation cannot be deemed unreasonable solely because the disabled employee has failed to satisfy standard eligibility requirements for the benefit.  Such a conclusion would turn the ADA's accommodation requirement on its head.  See Barnett, 535 U.S. at 397 ("[P]references will sometimes prove necessary to achieve the Act's basic equal opportunity goal.); id. at 398 ("The simple fact that an accommodation would provide a 'preference' – in the sense that it would permit the worker with a disability to violate a rule that others must obey – cannot, in and of itself, automatically show that the accommodation is not 'reasonable.'").

A disabled employee may not be entitled to an otherwise reasonable accommodation, however, if granting the accommodation would result in displacing employees with "superior rights."  Id. at 393.  The Supreme Court held in Barnett that, with some exceptions, a seniority system will prevail over an accommodations request that conflicts with the system's rules, protecting "employee expectations of fair, uniform treatment."  Id. at 394, 404.  Liberty Mutual equates the assignment of MM accounts with

---

[18] The record supports Tobin's belief that MM accounts were a fertile source of new sales.  Edward Mace, a colleague of Tobin's at Liberty Mutual, testified that about fifty percent of his sales in 1999 and 2000 derived from group accounts.  He further stated that most sales representatives would have the same percentage of group sales.  However, another sales representative, Leonard Shepard, reported that not all group accounts were equally productive.

such a system, asserting that Tobin should not be allowed to circumvent the company's established assignment policy.

Even accepting the analogy between the <u>Barnett</u> seniority system and the MM assignment policy for purposes of our discussion, Liberty Mutual's argument is unavailing. The Court acknowledged that its holding in <u>Barnett</u>, which applied to the "uniform, impersonal operation of seniority rules," <u>id.</u> at 404, might be inapplicable where "special circumstances" altered employees' expectations of "consistent, uniform treatment," <u>id.</u> at 404-05. The Court cited as examples of such circumstances the employer's retention of the right to change the seniority system unilaterally, along with its exercise of that right "fairly frequently," and also when a system already contained exceptions "such that, in the circumstances, one further exception is unlikely to matter." <u>Id.</u> at 405. Both of those examples are relevant here.

Despite the performance eligibility criteria for MM assignments articulated by Liberty Mutual's witnesses,[19] the evidence at trial showed that the accounts were awarded on a case-by-case, discretionary basis and not always as a reward for sales performance. Robin, who was Tobin's sales manager through 1998, testified that new sales representatives sometimes were assigned MM accounts to jump-start their business. He stated: "[W]e had an

---

[19] These criteria were detailed in a memorandum that Schwitters distributed to the sales representatives early in her tenure as sales manager.

inducement to give the Mass Marketing accounts to some of the newer people because it helped them get off to a fast start and make it in the insurance industry." Robert Nadeau, the assistant regional sales manager during the relevant period, testified that some low-producing sales representatives also received MM accounts because they had sold MM accounts themselves and did not have Tobin's extended history of failing to meet minimum standards. Both Robin and Nadeau indicated that they had the discretion to give Tobin an MM account, but chose not to do so. Thus, unlike in a fixed seniority system, allocating an MM opportunity to Tobin could not have frustrated any individual's expectation of receiving that assignment. Based on this evidence, the jury permissibly could conclude that giving Tobin an MM opportunity would be a feasible accommodation.

## B. Ability to Handle MM Accounts

Liberty Mutual's second contention – that assigning Tobin an MM account was not reasonable because his disability rendered him unable to manage those accounts – is more substantial. If a proposed accommodation would not be feasible <u>for the employee</u>, it would not assist him in performing his job duties. <u>See</u> <u>Reed</u>, 244 F.3d at 259 (holding that, in order to prove "reasonable accommodation," a plaintiff must prove not only that the proposed accommodation is "feasible for the employer under the circumstances" but also that it "would enable h[im] to perform the

essential functions of h[is] job"); id. (stating that "proving an accommodation's effectiveness is part of the plaintiff's burden"). Liberty Mutual elicited evidence that managing an MM account required good organizational skills and the ability to work quickly because sales representatives are sometimes "bombarded" with questions from potential or current clients during their on-site sessions with company employees. Leonard Shepard, the sales representative with the most MM accounts during Tobin's tenure, testified that his encounters with clients at one company, EMC, were "hectic" and occurred in "a high pressure atmosphere" – environments that were difficult for Tobin.

Unquestionably, such evidence raises some doubt about Tobin's ability to handle MM accounts. However, Robin admitted at trial that, when asked during his deposition why he had not given Tobin an MM account, he had not expressed concern about Tobin's competence. Rather, his reasons focused on Tobin's longstanding under-performance.[20] At trial, Robin reiterated the low-performance concern, as well as a concern about Tobin's ability, and noted that Tobin "did nothing to help himself get Mass Marketing accounts."

---

[20] In his deposition, Robin offered three reasons for declining to give Tobin an MM account: (1) that Tobin was not meeting his goal for life insurance sales, (2) he had not done enough prospecting for MM accounts on his own, and (3) he was not meeting Liberty Mutual's overall sales objectives. When asked if Tobin's "level of disorganization and lack of follow-through" would affect his ability to handle an MM account, Robin stated that he would have had concerns "if it were a large account."

Robin explained that he considered it unfair when "other reps [were] out prospecting to get them on their own to just give one to [Tobin] when he was doing nothing to help himself."[21] This testimony, in light of Robin's earlier deposition statements, permitted the jury to infer that Tobin was denied MM accounts primarily because Robin considered him to be undeserving rather than unable to manage them.[22]

Indeed, other evidence allowed the jury to find that Tobin could have competently handled an MM account and that Robin had admitted as much. Robin testified that it "could be a reasonable assumption" that Tobin would have been able to sell more policies if he had access to more people who wanted to buy insurance. At his deposition, Robin agreed that his reports on Tobin stated that he was "good at closing sales,"[23] and Robin also stated at that time

---

[21] At trial, Robin also gave three reasons for denying Tobin an MM assignment: (1) his failure to do his own prospecting, (2) the desire to give MM accounts to new people to give them "a fast start," and (3) doubts about Tobin's "ability to effectively manage a Mass Marketing account to get the most out of it that we could get out of it."

[22] Liberty Mutual sought to offset the suggestion that Robin had only recently adopted a more negative evaluation of Tobin's abilities by eliciting testimony that Robin, who left his job at Liberty Mutual in 1998, had not had access to documents at the time of his deposition that he had reviewed before testifying at trial. But we cannot say that the jury was obliged to credit that explanation or to disregard Robin's repeated assertion that Tobin was not given an MM account because he had not earned it.

[23] At trial, Robin testified that Tobin's closing skills were "[g]ood on property and casualty sales, and poor on life insurance sales."

that Tobin's sales results would have improved if he had been assigned MM accounts.[24] Edward Mace, another Liberty Mutual sales representative, testified that some MM accounts were "relatively easy" to handle because the company would pre-schedule appointments, and "[y]ou could sit down and have your day planned ahead for you." Mace also reported that the individual interviews could be spaced farther apart, reducing the time pressure, and that there was a routine to the process – further evidence that handling MM accounts would be manageable despite Tobin's disability.

Taken together, this evidence suggests that access to MM accounts might in fact have given Tobin the "jump start" he claimed to need to compensate for his disability, allowing him to focus on

---

[24] The following exchange from Robin's deposition on January 29, 2003 was read to the jury:

QUESTION: Is it fair to say, sir, in terms of prospecting, the difference between servicing a Mass.[sic] Merchandising account and just doing this with the general population is that the Mass Merchandising account, the Human Resources Department of the employer would identify the prospects for you?
ANSWER: They would be in many cases of great assistance.
QUESTION: And in fact, after these prospects were identified by the HR department of the company, the manner of sales that were generated from that prospect would be partially dependent on your ability to close sales?
ANSWER: Correct.
QUESTION: And Kevin was reasonably good at closing sales?
ANSWER: Correct
QUESTION: And had Kevin been assigned some of these Mass Marketing accounts, his sales results would have improved dramatically, wouldn't they? . . .
[ANSWER:] My assumption would be that the sales results would have been – would have improved.

what he could do well – close sales – rather than on prospecting for new business.  To be sure, the evidence of Tobin's ability to manage MM accounts was controverted.  As we have described, however, the jury had before it sufficient evidence to conclude that assignment to an MM account would have enabled Tobin to achieve his sales quotas and thus to perform the essential functions of his job – making such an assignment a "reasonable accommodation."[25]

## C.  Undue Hardship

Having concluded that the jury could find that it was "feasible for [Liberty Mutual] under the circumstances" to assign

---

[25] Indeed, in his concurring opinion when this case previously was before us, Judge Howard noted that Tobin already had "generated sufficient record evidence to permit the conclusion that assigning him to a mass marketing account would have assisted him in overcoming the particular limitation caused by his bipolar disability."  433 F.3d at 110.  Judge Howard continued:

> Tobin's supervisor testified that Tobin's biggest problem "was identifying potential new customers and going to see them" but that "he [did] a good job at closing the sale." There was also evidence that, because mass marketing accounts provide the assigned agent with a captive audience of potential clients, closing skills are more important than business generation skills for agents assigned to these accounts.  On this evidence, a reasonable jury could conclude that assigning Tobin to a mass marketing account would have assisted him in overcoming his disability-related problem of being insufficiently organized to identify and pursue new clients.

Id. at 110-111.

Tobin to one or more MM accounts, see Reed, 244 F.3d at 259, we turn to whether there are "further costs to be considered, certain devils in the details" that would make such an accommodation an undue hardship on the company. Id. In this case, as in many, only a fine line exists between the employee's showing of reasonableness and the company's claim of undue hardship. Id. at 260 ("[I]n many cases the dividing line between 'reasonable accommodation' and 'undue hardship' will be inexact – but benignly so."). In claiming hardship, Liberty Mutual posits that placing Tobin in charge of an MM account would have put the insurer's business with the MM client in jeopardy. Robin testified that, at times, Tobin did not always "seem fully functional so that I would be comfortable putting him in front of customers." Robin also expressed concern that, with Tobin as the sales representative, "we could blow up a very large national account or even a well-known local account." Robin gave as an example EMC Corporation, whose representatives, he said, "complained at the slightest, slightest screw-up that a sales rep. made."[26]

---

[26] Schwitters testified that EMC was a fast-growing company in early 1999, shortly after she became a sales manager and Tobin's supervisor. The company, which she said was "on the verge of [its] patent," was adding locations and employees, and Schwitters assigned three new sales representatives to EMC in April and an additional representative later in 1999. Schwitters described EMC as "the most demanding customer I have ever dealt with in my career, but rightfully so [because t]hey were high security."

This evidence does not compel judgment for Liberty Mutual. Although Robin's testimony indicates that assigning Tobin to the EMC account may have imposed undue risk on the company, EMC was not Liberty Mutual's only MM client. Mace testified that some such accounts were "relatively easy" to handle, and flexibility was possible. He also reported that imperfect matches between sales representatives and MM clients had occurred in the past and were resolved by changing the representative.[27] Thus, the jury could have concluded that any problem arising from Tobin's placement in an MM account he could not properly manage would not have exposed the company to undue hardship. If a conflict arose or Tobin was unable to meet the client's expectations, Liberty Mutual would have been able to solve the problem by changing personnel.[28]

We therefore agree with the district court that the record permitted the jury to conclude that Liberty Mutual refused to reasonably accommodate Tobin by assigning him to one or more MM accounts.

---

[27] In response to a question from counsel, Mace agreed that it "sometimes happens[] that the Mass Merchandising customer is not happy with the sales rep that's been assigned by Liberty Mutual; and, so, the Liberty Mutual manager . . . will need to find a replacement."

[28] Indeed, Tobin testified that "the way I wanted to do it, if they were afraid that I would foul up the account, was to have Nina [Schwitters] come out with me for the first few weeks and see if I was doing all right."

Liberty Mutual argues that the record contains insufficient evidence to support the jury's inclusion of front and back pay in Tobin's compensatory damages award. Tobin was awarded approximately $440,000 in lost wages to cover the period between his termination and the date of his anticipated retirement at age 62.[29] The company asserts that these damages were improper because Tobin failed to show that Liberty Mutual's conduct caused the total disability that he claims prevented him from obtaining another job.

A victim of employment discrimination ordinarily has the duty to mitigate damages by seeking alternative employment. Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 379 (1st Cir. 2004); Blockel v. J.C. Penney Co., 337 F.3d 17, 27 (1st Cir. 2003). However, the employer may be held responsible for the entire amount of lost salary notwithstanding the employee's failure to obtain another job "[i]f the employer's unlawful conduct caused the

---

[29] A back-pay award compensates a plaintiff for lost wages up to the time of the trial court judgment. Johnson, 364 F.3d at 379. Front pay is awarded for lost salary during the period between judgment and reinstatement, or in lieu of reinstatement. Id. In this case, the verdict form did not specifically refer to the salary amounts as "back pay" or "front pay," but asked the jury to specify the damages for particular time periods. The jury awarded $143,532 for the period between January 10, 2001 – the date of Tobin's termination – and April 1, 2003 – the date he began to receive Social Security disability benefits. It awarded $204,560 for the period between April 1, 2003 and May 8, 2006, the date of the verdict. It assessed $91,223 for the period between the verdict and September 26, 2007 – the date Tobin had planned to retire.

employee's inability to mitigate damages."  Johnson, 364 F.3d at 384.  In other words, if an employee is unable to work because of a disability "caused" by the employer, the employee may obtain compensation for the resulting lost pay.  See id. at 383; Blockel, 337 F.3d at 27-28.[30]

The district court concluded that the evidence offered at trial did not inevitably link Tobin's incapacity to Liberty Mutual's conduct, observing that "one could argue" that the evidence merely "'create[d] an issue regarding whether the [failure to accommodate] . . . was one among numerous other independent and significant contributing factors to [Tobin]'s psychological

---

[30] The legal principles governing awards of front and back pay differ.  Back pay is "'a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case.'"  Johnson, 364 F.3d at 379 (quoting Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1171 (6th Cir. 1996)).  Front pay awards are not as readily made:

> An award of front pay that extends over many years to an estimated retirement date should be examined carefully . . . since "the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer."

Cummings v. Standard Register Co., 265 F.3d 56, 66 (1st Cir. 2001) (quoting Conway v. Electro Switch Corp., 523 N.E.2d 255, 257 (Mass. 1988)); see also Johnson, 364 F.3d at 380 ("Awards of front pay . . . are available in a more limited set of circumstances than back pay.").  In this case, the difference is immaterial.  Liberty Mutual argues that neither form of compensation is appropriate because the jury had no basis for concluding that the company was responsible for Tobin's asserted inability to secure other employment.

disability.'"  Tobin v. Liberty Mut. Ins. Co., 2007 WL 967860, at

*9 (D. Mass.  March 29, 2007)(quoting Johnson, 364 F.3d at 384).

The court noted, however, that "[i]mplicit in the jury's award of

lost pay for January 10, 2001 through September 26, 2007 is a

finding that Liberty Mutual's mistreatment of Tobin caused his

total disability such that he has not failed to mitigate damages by

not securing other gainful employment." Id.  The court declined to

disturb the lost pay award, implicitly ruling that there was

sufficient evidence to support the jury's causation finding.[31]

Reviewing the evidence in the light most favorable to the

jury's verdict, we conclude that there was a sufficient factual

basis for the jury's findings on front and back pay.  Both Tobin

and his psychiatrist, Dr. William Kantar, testified about the

impact of the probationary and warning periods that Liberty Mutual

repeatedly imposed on Tobin between 1997 and 2000.  Although

---

[31] In Johnson, we observed that juries typically are asked to decide the issue of back pay only when, as in this case, they also are resolving issues of liability and other forms of compensatory damages.  364 F.3d at 380.  Front pay awards "are generally entrusted to the district judge's discretion." Id.  The court's role in awarding back and front pay is attributable to the equitable nature of such relief.  See Lussier v. Runyon, 50 F.3d 1103, 1108 (1st Cir. 1995) ("It follows a fortiori from the equitable nature of the remedy that the decision to award or withhold front pay is, at the outset, within the equitable discretion of the trial court.") (some emphasis omitted); Santiago-Negron v. Castro-Davila, 865 F.2d 431, 441 (1st Cir. 1989) (recognizing the equitable origin of back pay damages, but holding that such an award is a jury issue when it is "a factor of compensatory damages").  Here, as we have described, the jury was asked to set the amounts for both past and future lost wages.

Liberty Mutual's conduct outside the limitations period does not provide a basis for damages, evidence of such conduct and its effects shed light on the impact of Liberty Mutual's later refusals to accommodate Tobin. See Morgan, 536 U.S. at 113 (noting that an employee may use time-barred discriminatory acts "as background evidence in support of a timely claim"); Ocean Spray, 808 N.E.2d at 270 (same).

Kantar testified that, when Tobin perceives a lack of support, "his agitation or fragmentation increases." When asked if a perceived lack of support could decrease Tobin's functionality "to a point where he was dysfunctional," Kantar responded: "I feel that it did." During the probationary period at the end of 2000, Tobin "got significantly worse in terms of his ability to function, to meet his responsibilities, to deal with the stresses that he faced." Kantar reported that, by contrast, when Tobin feels understood and supported, "it enables him to calm down; the agitation is reduced; the disorganization is reduced; and he is able to apply his abilities." According to Kantar, the perception of support "would . . . tend to increase his functionality."

Tobin confirmed this view. He testified that the probation letters "really made me less functional" and that it was "devastating" to confront the reactivation of a warning period as soon as he returned to a full-time schedule after each disability leave. Tobin recalled that when he was placed on warning after the

-44-

second leave, he felt as if he had been "punched right in the stomach." He testified that the warning undid "all of the good" from his work with the nurse whom Liberty Mutual had hired to assist him: "It just . . . blew the wind out of my sails."

By the time Tobin started his last probation period, he felt "exhausted," and he reported that the fatigue "made me less focused. . . . [M]y concentration skills laxed. It affected my sleep, my weight, my appetite." Months after his termination, Tobin testified, he felt even worse and experienced "almost like post-traumatic syndrome." Those feelings continued to the time of trial: "I live with it every day. I have nightmares. It's just devastating." Kantar reinforced the ongoing nature of Tobin's disability: "As I look at Mr. Tobin's life over the years, he has been unable to move on in his life. He's not been able to pursue employment."

This evidence allowed the jury to find that the lack of support reflected in the company's final denial of accommodations further exacerbated Tobin's stress and precipitated his total inability to function in the workplace. Although the company points to other stressors in Tobin's life that could have contributed to his disability – including family conflicts and additional medical issues – the jury was free to credit the evidence showing a link between Tobin's status at work and his mental condition. Based on that evidence, the jury could have

concluded that Liberty Mutual's refusal to accommodate Tobin's disability in early 2001 denied him a last chance to avoid the termination with which he had been threatened, increasing the stress that, in turn, exacerbated his functional difficulties. Losing the job predictably resulted in more anguish, and the jury could have found that it caused further deterioration of his functional abilities.

The facts here differ from those we considered in Johnson, 364 F.3d at 383, a case highlighted by Liberty Mutual. A jury found that plaintiff Johnson had been constructively discharged from his job at Spencer Press because of harassment on account of his religion. Id. at 375. On appeal, we reviewed the district court's ruling that Johnson's eligibility for front and back pay ended when he was fired from a new job and he did not again seek employment to mitigate damages. Johnson, however, had claimed that his disability prevented him from resuming work. Id. at 383. We acknowledged that he would be entitled to continuing lost wages if his total disability had been caused by Spencer Press, but concluded that the evidence was insufficient to establish such causation. Id. at 383-84.

Johnson's doctor had reported that the harassment he suffered "'exacerbated his depression and panic and anxiety disorders,'" but also noted that he had "'other issues in his life, including family deaths, divorce, and problems with his sons.'" Id. The doctor

then went on to say that he "did not make a determination as to what event or events, if any, caused [Johnson's] depression and panic and anxiety disorders." Id. The doctor thus declined to confirm a link between the defendant's conduct and the plaintiff's condition. We commented that this testimony "may have created a genuine question of fact about whether there was some relationship between the harassment at Spencer Press and Johnson's disability," but it was not enough to stave off summary judgment in light of other factors. Specifically, we pointed to the "numerous other significant problems in his life that may have been causally related to his disability" and to the fact that Johnson had found a new job immediately after leaving Spencer Press and kept the job for seven months, until he was fired for violating company rules. Id.

We already have noted that Tobin, too, had other causes of stress in his life, and he also was able to find a job after leaving Liberty Mutual. However, the evidence concerning his post-termination employment at another insurance agency served to reinforce, rather than undermine, his claim for lost wages. Tobin stated that he was able to function during his thirteen months at the job when the work was easy, but he had no net earnings during that time. He also testified that "I really could not do the

-47-

job."[32]  Nor was Kantar's testimony as equivocal as the expert's testimony in Johnson; Kantar specifically attributed psychological harm to Tobin from Liberty Mutual's conduct.  A causal link was explicitly drawn, for example, in Kantar's testimony that the first resumption of Tobin's warning period "set in motion again all the turmoil about how he was going to survive," and the warning after his second disability leave "sen[t] him into turmoil again."

In sum, unlike in Johnson, the jury could properly trace Tobin's incapacitation to his employer's conduct.  We therefore reject Liberty Mutual's contention that the jury lacked a factual basis for awarding Tobin front and back pay.

## V.

Liberty Mutual argues that the jury's award of $500,000 for emotional distress was "grossly excessive" and that the district court consequently erred in refusing to grant a remittitur.  We review the district court's denial of remittitur only for abuse of discretion.  Koster v. Trans World Airlines, 181 F.3d 24, 34 (1st Cir. 1999).  "We will not disturb an award of damages because it is extremely generous or because we think the damages are considerably less," but will adhere to the jury's judgment unless the damages awarded are "so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law."  Id.;

---

[32] In 2002, his income of $5,355 was offset by a $7,062 deduction for business miles; in 2003, he earned $1,641 and deducted $3,121 for mileage.

see also McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006).

The district court observed that "the award was certainly generous and at the outer reaches of a reasonable jury verdict," placing the damages amount within "the range which might be deemed excessive by the First Circuit and the Supreme Judicial Court." Tobin, 2007 WL 967860, at *8. Nonetheless, the court concluded that Tobin's circumstances were "more extreme" than the plaintiffs' situations in two cases emphasized by Liberty Mutual where remittitur had been ordered, Koster and Labonte v. Hutchins & Wheeler, 678 N.E.2d 853 (Mass. 1997), and it declined to enter such an order here. Id.

The district court did not abuse its discretion in allowing the jury's verdict to stand. Although Liberty Mutual argues that Tobin "failed to present any evidence even hinting that his psychological condition was worsened by Liberty Mutual's failure to accommodate his disability," other than his "own, self-serving testimony," we already have explained why the jury permissibly could conclude that the company's denial of accommodations caused his total disability. As recounted above, both Tobin and Kantar testified that at the time of trial – five years after he left the company – Tobin continued to suffer severe emotional distress from Liberty Mutual's failure to provide reasonable accommodations that the jury found would have enabled him to successfully perform his

job.  Moreover, Tobin had spent thirty-seven years at the company – his entire working life.  Kantar observed that "his identity has been connected with Liberty Mutual" and that being "a sales rep for Liberty Mutual [is] . . . part of who he is."  Kantar reported that Tobin was "devastated" by the way the termination occurred, perceiving it as a betrayal.  Tobin also was told incorrectly on the day of his termination that he and his family no longer had health insurance coverage, information that was particularly alarming in light of his wife's ongoing treatment for breast cancer.[33]

As the district court recognized, the lasting nature of Tobin's distress and his total incapacity distinguish this case from others in which large awards have been found unjustified.  In Koster, 181 F.3d at 36, we concluded that an emotional distress award of $716,000 was excessive and that the evidence would support a maximum recovery of $250,000.  However, "[t]here was no evidence that Koster ever sought medical treatment or suffered any long-term depression or incapacitation" and, indeed, Koster opened a business of his own after losing his job.  Id. at 36.[34]

---

[33] Tobin was told two days later that his coverage would, in fact, continue.  He described the intervening period as "two days of turmoil."

[34] We note that, pursuant to state law, the district court had doubled the damages awarded to Koster by the jury, effectively allowing $1.432 million for emotional distress.  See 181 F.3d at 28, 34.  Thus, if the court applied the same multiplier on remand, the $250,000 recovery that we deemed permissible would have become

Similarly, in Labonte, 678 N.E.2d at 861-62, the court rejected a $550,000 award for emotional distress where the plaintiff's post-termination depression abated when he found a new job and enrolled in a doctoral program. In Hetzel v. County of Prince William, 89 F.3d 169 (4th Cir. 1996), another case on which Liberty Mutual relies, the court found the $500,000 award for emotional distress to be unsupported where the plaintiff remained employed in her job as a police officer, "continue[d] to perform her duties with no noticeable diminution in performance," "ha[d] no observable injuries or physical ailments," and had sought no help – professional or otherwise – to deal with her asserted emotional difficulties. Id. at 171.

In sum, we find our assessment in a prior case equally apt here: "Given this precedent, the deferential standard of review, and 'the esoteric nature of damages for emotional distress,' the award in this case, while high, is not so high that we should disturb it." McDonough, 452 F.3d at 22 (citation omitted).

**VI.**

Liberty Mutual contends that the district court erred in assessing interest on the damages award at the prejudgment rate, rather than at the lower post-judgment rate,[35] for the time period

a $500,000 award. See id. at 36 n.5.

[35] In a Memorandum and Order issued April 11, 2007, the district court noted the "substantial difference" in the applicable interest rates: 12% for prejudgment interest and 4.98% for post-

-51-

between the original entry of judgment on the jury verdict, on May 9, 2006, and the date of the Second Amended Judgment, April 11, 2007.[36]  We review this contention de novo.  R.I. Charities Trust v. Engelhard Corp., 267 F.3d 3, 5 (1st Cir. 2001).

It is well established that prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court, Conway, 825 F.2d at 602; Blockel, 337 F.3d at 29, while post-judgment interest, even on state-law claims, is governed by federal law, Cummings, 265 F.3d at 68.  Liberty Mutual does not contest the district court's decision to adopt Massachusetts law for the prejudgment interest rate.  It challenges only the period of time for which the state's 12% rate is applicable.

Prejudgment interest in Massachusetts "ordinarily applies to that period from the date of commencement [of suit] to the date on which judgment is entered."  Foley v. City of Lowell, Mass., 948 F.2d 10, 17 (1st Cir. 1991) (citation and internal quotation marks omitted) (substitution in original); Mass. Gen. Laws Ann. ch. 231, § 6B (stating that "there shall be added by the clerk of court to

_____

judgment interest.

[36] The district court originally entered judgment on May 9, 2006 based on the jury's verdict the previous day.  An Amended Judgment was entered on March 30, 2007 to reflect Tobin's acceptance of the remittitur.  Both parties then filed objections to the calculation of prejudgment interest.  The Second Amended Judgment was entered on April 11, 2007, after the court issued a Memorandum and Order addressing their contentions.

-52-

the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action"). In asserting that the end date for calculating Massachusetts prejudgment interest is the date of the original entry of judgment, Liberty Mutual relies on cases holding that, under federal law, post-judgment interest ordinarily begins to accrue at that time. See, e.g., Cordero v. DeJesus-Mendez, 922 F.2d 11, 17 (1st Cir. 1990) (holding that, "[w]here an original judgment is upheld for the most part but modified on remand, post-judgment interest should accrue from the date of the first judgment"); Marshall v. Perez-Arzuaga, 866 F.2d 521, 524 (1st Cir. 1989) (holding that equity supports "accruing post-judgment interest from entry of a judgment on a verdict rather than from the date a motion for a judgment N.O.V. is denied").

However, a successful plaintiff's right to a particular remedy under federal law does not trump his right to a more advantageous remedy under state law. When federal and state claims overlap, the plaintiff may choose to be awarded damages based on state law if that law offers a more generous outcome than federal law. Doty v. Sewall, 908 F.2d 1053, 1063 (1st Cir. 1990); id. ("[W]here, as here, the claims under federal and state law, and the damages awarded therefore, are identical, a plaintiff is entitled to select the body of law under which the damages will be paid."). We have specifically applied that principle to the award of prejudgment

interest in cases involving "wholly symmetrical" claims, holding that a plaintiff in such a case has the option to invoke either "federal or state law, whichever affords her the better interest rate." Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 78 (1st Cir. 2001); see also Doty, 908 F.2d at 1063.[37]

Here, too, the claims under federal and Massachusetts law are substantively identical, and the jury's special verdict did not distinguish between them. See Doty, 908 F.2d at 1063 ("[E]xamination of the special verdict form makes it clear that damages for the two claims were provided generally, and were not segregated into separate federal and state components."). Thus, Liberty Mutual may not rely on federal case law establishing the

---

[37] The issue in Conetta was the proper rate of prejudgment interest. Under federal law, the award of prejudgment interest and the appropriate rate, if not prescribed by the statute providing the plaintiff's recovery, are discretionary decisions for the judge. Conetta, 236 F.3d at 77; Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 224-25 (1st Cir. 1996) ("[I]f the particular federal statute is silent, courts have discretion to select an appropriate rate, and they may look to outside sources, including state law, for guidance."). The district court in Conetta initially ordered prejudgment interest at six percent, but increased the rate in response to a post-judgment motion to the twelve percent figure set by state law (in that instance, Rhode Island). In Doty, the district court had denied prejudgment interest on the damages awarded for pendent Massachusetts claims. 908 F.2d at 1062-63. In both instances, we held that, because the state and federal claims were identical, the plaintiff was entitled to the advantages provided by state law.

start date for post-judgment interest to deny Tobin a more favorable result under state law.[38]

The question thus becomes whether prejudgment interest under Massachusetts law runs to the date of the original entry of judgment or to the date of the trial court's later entry of final judgment. Although we have found no cases explicitly addressing that question, we have in the past ruled that the final judgment establishes the proper end date for the accrual of prejudgment interest. See Foley, 948 F.2d at 17. The district court here also treated the question as self-evident: "[I]t is the final judgment in the District Court that is determinative. The second amended judgment will be the touchstone for appellate evaluation." Memorandum and Order, April 11, 2007, at 5.

In Foley, where the plaintiff also brought parallel claims under federal and state laws, the district court had awarded prejudgment interest from the date of the suit (November 27, 1985), only to the date the jury verdict was returned (June 6, 1989). Entry of judgment on the verdict had occurred on June 30, 1989, although final judgment was not entered until December 6, 1990.

---

[38] Where the federal and state claims are not fully aligned, however, it would be "appropriate for the district court to consider applicable federal standards in fashioning an interest award." Conway, 825 F.2d at 602; see also Doty, 908 F.2d at 1063 ("Ordinarily, where the component of state law damages is not clearly discernible, it is appropriate for the district court to consider federal standards in determining the propriety of prejudgment interest.").

Id. at 16-17.  We agreed with the plaintiff's contention that the court "improperly truncated the prejudgment interest period, thereby costing him the benefit, for an eighteen-month period, of the rate differential between prejudgment and post-judgment interest."  Id. at 17.  In other words, we held that under Massachusetts law the plaintiff was presumptively entitled to prejudgment interest until final judgment was entered.  Id.[39]  We then observed:

> Because the plaintiff is entitled to prejudgment interest on the damage award from November 27, 1985 until final judgment was entered on December 6, 1990, postjudgment interest on damages (originally specified by the district court to start on June 6, 1989) must be deferred to dovetail with the end of the prejudgment interest period.

Id. at 18 n.10.

We see no reason here to depart from our approach in Foley.  Accrual of prejudgment interest until final judgment discourages frivolous post-verdict motions by a losing defendant, accelerating payment of the debt owed to the plaintiff.  Cf. Marshall, 866 F.2d at 524 (noting that, when motions for judgment N.O.V. are unsuccessful, "equity strongly favors awarding the plaintiff post-judgment interest during the pendency of the motions because the

---

[39] The entitlement was "presumptive" because "a trial court has some discretion under Massachusetts practice to adjust an interest award if a prevailing litigant has been responsible for unnecessary delays."  Foley, 948 F.2d at 17-18 (citing Currier v. Malden Redev. Auth., 449 N.E.2d 679, 681 (Mass. 1983)).

defendant, a judgment debtor, had possession and control of the funds during that period").  If such an assessment would be unjust in a particular case, the trial court – as we noted in Foley – would have the discretion to modify the interest award.  See 948 F.2d at 17-18.  No such concerns have been asserted here.  We therefore leave undisturbed the district court's award of prejudgment interest.

## VII.

In his cross-appeal, Tobin contends that the district court erred in refusing to instruct the jury on punitive damages.  We review de novo a district court's determination that the evidence does not warrant a punitive damages instruction.  McDonough, 452 F.3d at 23; Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 41 (1st Cir. 2003).

Under federal law, "punitive damages in discrimination cases are authorized 'in only a subset of cases involving intentional discrimination.'"  Che, 342 F.3d at 41 (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534 (1999)).  To establish a basis for punitive damages, the plaintiff must, in addition to proving intentional discrimination, "show[] that the employer acted with malice or reckless indifference to federally protected rights."  McDonough, 452 F.3d at 23.  This formulation means that the employer must have "at least discriminate[d] in the face of a perceived risk that its actions [would] violate federal law."

-57-

Kolstad, 527 U.S. at 536; see also McDonough, 452 F.3d at 24 ("[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law.").[40]

Tobin emphasizes Liberty Mutual's repeated rejections of his requests for assistance, testimony at trial by some of his superiors denying knowledge of his disability, and the company's meticulous building of a written record that documented his deficiencies – all of which he asserts was evidence of the company's intentional disregard of its responsibility to accommodate his disability while it "orchestrated" his discharge. The district court viewed the sum of the evidence differently in explaining its rejection of the punitive damages instruction:

> The short of it is what happened here was the grim grinding of the bureaucratic enterprise toward a result. At each point, consideration was given – whether or not correctly, but consideration was given – by the defendant to the relevant factors. This is not one that comes within either the federal or the state definition of punitive damages.

We agree that the evidence is insufficient to support punitive damages. Although the jury supportably found that assignment to MM

---

[40] The Massachusetts standard is similar. Punitive damages are authorized where the defendant's conduct is "'outrageous[] because of the defendant's evil motive or his reckless indifference to the rights of others.'" Dartt v. Browning-Ferris Indus., 691 N.E.2d 526, 537 (Mass. 1998) (quoting Restatement (Second) of Torts § 908(2) (1979)). Our discussion of the issue under federal law thus embraces the state-law issue as well. See McDonough, 452 F.3d at 24 n.10.

accounts would have enabled Tobin to perform the essential functions of his job, the evidence allowing that conclusion does not reflect "malice or reckless indifference" by Liberty Mutual toward Tobin's rights. That evidence, which concerned Tobin's capabilities and the skills required for MM accounts, shows only that the company was unjustified in denying him the opportunity.

We recognize that the record contains some troubling evidence, including the implausible testimony of Schwitters and Vance that they were unaware that Tobin had a disability in the year leading up to his termination. However, his superiors' general insensitivity to his circumstances does not provide a basis for concluding that the particular conduct found actionable by the jury was committed "in the face of a perceived risk that [the] action[] will violate federal law," Kolstad, 527 U.S. at 536. Indeed, if, as Tobin asserts, his supervisors were trying to create a record of poor performance so that he could be terminated "lawfully," it would make no sense for the company to consciously risk violating the law by refusing an accommodation it believed was reasonable.

Moreover, unlike some acts of discrimination – such as retaliation for an employee's exercise of protected rights – rejection of a requested accommodation does not by itself suggest that the employer knew its conduct may be in violation of the law. Cf., e.g., McDonough, 452 F.3d at 23 (finding punitive damages instruction warranted where plaintiff alleged retaliation for assisting with another employee's sexual harassment claim); Che,

342 F.3d at 41 ("When a jury finds that an employer has engaged in intentional discriminatory retaliation, the employer's actions and the effect of those actions are closely connected in a way not necessarily present in other types of cases.").

In short, the evidence supports the jury's finding that Liberty Mutual misjudged the reasonableness of the accommodations requested by Tobin, and thereby exposed the company to liability under federal and state disability laws, but it does not reveal the kind of intentional or reckless indifference to federal rights required to support an award of punitive damages.  See Smith v. Bell Atl., 829 N.E.2d 228, 245 (Mass. App. Ct. 2005) ("[T]he company's behavior, while actionable, was not so egregious as to warrant the condemnation and enhanced deterrence that underlie the imposition of punitive damages.").

## VIII.

Tobin also asserts that the district court abused its discretion in denying his request for attorney's fees.  He notes that a fee award is "virtually obligatory" for prevailing plaintiffs in ADA cases, see Race v. Toledo-Davila, 291 F.3d 857, 858 (1st Cir. 2002) (per curiam), and that attorney's fees are mandated for a plaintiff who recovers under Chapter 151B.  See Mass. Gen. Laws Ann. ch. 151B, § 9.

The flaw in this argument is that the court did not summarily reject Tobin's entitlement to fees, but merely postponed such an award.  The court explained that, because of the "close and

contestable character of the issues," it was denying the fees, "without prejudice, pending final resolution of the case." <u>Tobin</u>, 2007 WL 967860, at *11.  Although the better practice where fees are mandated by statute would be to set the fee at the conclusion of the trial, allowing the parties to appeal the fee award along with any substantive issues, we decline to deny the court the discretion to take a different approach in particular instances. Here, the district court considered the possibility that one or more of its rulings would be reversed, and it concluded that judicial efficiency would be better served by delaying the fee decision.  Tobin cites no authority forbidding that pragmatic exercise of the court's discretion, and such a prohibition strikes us as inadvisable.

In any event, at this juncture, the issue is moot.  Whether or not the court erred, the case must now be remanded so that the district court may calculate an appropriate fee.  In so doing, it should address both the trial and appellate proceedings.  <u>See</u> <u>Powell</u> v. <u>Alexander</u>, 391 F.3d 1, 24 (1st Cir. 2004).

<u>Affirmed.</u>