Mark JONES, Plaintiff

v.

**NATIONWIDE LIFE INSURANCE COMPANY, et al., Defendants.**

**C.A. No. 10–cv–30216–MAP.**

United States District Court, D. Massachusetts.

March 5, 2012.

Maurice M. Cahillane, Jr., Egan, Flanagan & Cohen, PC, Springfield, MA, for Plaintiff.

Jessica L. Herbster, Sara G. Schwartz, Schwartz Hannum PC, Andover, MA, for Defendants.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO AMEND STATEMENT OF FACTS

### (Dkt. Nos. 31 and 52)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiff, Mark Jones, initially filed this complaint against his employers (Defendant Nationwide Life Insurance Company and certain affiliates) in the Massachusetts Superior Court, alleging employment discrimination based on disability in violation of Mass. Gen. Laws ch. 151B, § 9 (Count I).[1] After removal to this court in November of 2010, he amended his complaint to allege a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213 (Count II).

On November 10, 2011, Defendant filed a motion for summary judgment on both counts. (Dkt. No. 31.) Plaintiff opposed the motion and subsequently filed a motion to amend his reply brief with updated citations to the record. (Dkt. No. 52.) The court will allow Plaintiff's motion to amend but will, notwithstanding this ruling, allow Defendant's motion for summary judgment as well. As the discussion below will demonstrate, the record fails to support Plaintiff's claim that he suffered from a disability recognized either under federal law or the law of the Commonwealth of Massachusetts. In light of this fatal, threshold defect in Plaintiff's case, the court need not address several other arguments offered by Defendant in support of summary judgment.

### II. FACTS

In accordance with the dictates of Fed. R.Civ.P. 56, the facts are viewed in the light most favorable to Plaintiff, the non-moving party here.

Starting in March of 2000, Plaintiff was a Retirement Program Services Director for Defendant. His job was to oversee sales representatives selling 401(k)-like retirement plans to states and localities on behalf of an affiliate of Nationwide Life Insurance Company called Nationwide Retirement Services, Inc. ("NRS").

During the time of his employment, unbeknownst to Defendant until shortly before Plaintiff's termination, Plaintiff was suffering from brachial plexus palsy, the consequence of a 1979 motorcycle accident. The injury caused Plaintiff pain in his left

---

1. Defendant had previously worked for Nationwide Retirement Solutions Insurance Agency, but at the time of his termination he had been working for Nationwide Life Insurance Company for two years. The affiliates have been dismissed, and, in any event, they occupied no different position for purposes of this memorandum from Nationwide Life Insurance Company. The court will therefore refer to Defendant in the singular as either "Defendant" or "Nationwide."

arm and left him with impaired manual dexterity on that side.

In February 2006, Plaintiff broke his left shoulder. As a result, he required bone grafting and eventually developed a severe infection. Through 2008, the discomfort from his condition required Plaintiff to take prescription painkillers. Nevertheless, Plaintiff continued to work quite successfully, surpassing other managers at his level, except during June and July of 2008 when he was absent for surgery on his injured shoulder. Following this period, in a letter dated August 27, 2008, Plaintiff's treating physician described the medical cause for Plaintiff's absence, but she did not note any restrictions or modifications on Plaintiff's post-surgical ability to work. (Dkt. No. 33, Ex. F.37).

At some point, as part of a change in business strategy, Defendant began selling securities products as part of the package of retirement offerings it marketed to clients. In particular, it began offering a so-called managed account product called ProAccount in the spring of 2007. This product, unlike traditional insurance offerings, required sales representatives selling it to be licensed registered investment advisors—a certification that could only be obtained by passing the Financial Industry Regulatory Authority's ("FINRA") Series 65 and Series 66 exams.

On March 3, 2006, Defendant's broker-dealer, a company called Nationwide Investment Services Inc. ("NISC"), sent an email to certain employees of Defendant, including Plaintiff, notifying them that they would need to become registered investment advisers in order to sell ProAccount. (Dkt. No. 37, Ex. A.)

In December 2007, Plaintiff was informed by Defendant that any Nationwide employee selling ProAccount was required to take and pass the test under FINRA regulations and become a registered investment adviser by the end of 2008. Any employee who did not pass the test successfully and obtain the new credential would be terminated or reassigned to a different job. (Dkt. No. 34, Ex. 45.)

Plaintiff repeatedly failed the Series 65 exam and so was unable to become a registered investment advisor under Defendant's new policy. Many years earlier, in 1999, he had attempted to take the exam and failed. From April 2006 to October 2008 he took the exam four more times and failed to pass on each attempt. (Dkt. No. 37, Ex. I.) The record contains no evidence that Plaintiff's failure to pass the exam on these occasions resulted from any *physical* impairment related to his brachial plexus palsy.

Sometime before Plaintiff's October test, around September 2008, Plaintiff asked his supervisor, Barbara Anderson, for an extension to take the test until December 2008 given that he had undergone surgery over the summer. (Dkt. No. 47, Ex. 6.) It is unclear whether Plaintiff mentioned any medication-related cognitive impairments to Anderson, although Anderson—through her assistant—never noted any such impairments in her communications with Defendant's Human Resources Department about the issue. (*Id.*) Furthermore, Plaintiff's physician's report to Defendant about the surgery only mentioned that Plaintiff was taking the antibiotic Naficillin—not any prescription painkillers. (Dkt. No. 34, Ex. F.37.) The record suggests that Defendant denied Plaintiff's request for an extension at this time, but Plaintiff was somehow able to take the test again in December. Unfortunately, he once again failed. (Dkt. No. 47, Ex. 5.)

On December 23, 2008, Plaintiff called Anderson to report that he had failed the Series 65 exam again. At that point, Anderson told him his employment with

Defendant would be terminated. (Dkt. No. 33, Def.'s SUMF at ¶ 49).

On December 28, 2008, Plaintiff wrote Steven Angelis, his supervisor's supervisor and asked for additional time to pass the Series 65 exam. He told Angelis of his poor health resulting from his shoulder injury, and he added that he felt he could pass the exam if he had additional time to study. (Dkt. No. 35, Ex. F.)

For purposes of this memorandum, the court will assume that Plaintiff's December 28 letter constituted a request for an accommodation under the ADA and Mass. Gen. Laws ch. 151B—*i.e.*, a request for more time to take the exam—and Anderson's response on December 31 constituted a rejection of that request. Anderson also informed Plaintiff on December 31, 2008 that, because of his failure to pass the exam and obtain the required credential, he would be terminated from his job. (Dkt. No. 25, Ex. H.) His employment with Nationwide would be finally terminated within thirty days if he did not obtain some other slot elsewhere in the company. (Dkt. No. 34, Ex. I.) Plaintiff did not find another job within Nationwide, and his formal termination became final on January 31, 2009.

## III. DISCUSSION

■ The fundamentals are uncontroversial. First, the ADA and Mass. Gen. Laws ch. 151B are analyzed under the same framework. *Ward v. Mass. Health Research Inst. Inc.*, 209 F.3d 29, 33 n. 2 (1st Cir.2000). Second, summary judgment is appropriate where, under the applicable analytical standard, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### A. The Applicable Standard for Assessing "Disability".

Evolution of the standard to be applied in determining the existence of a disability under the ADA requires some preliminary comment. In 2008, Congress amended the ADA to clarify, and to some extent render more generous, the statute's standard for making this determination. *See* ADA Amendments Act of 2008 ("ADAA"), Pub.L. No. 100–325, § 8, 122 Stat. 3553. The new law took effect on January 1, 2009. *Id.* at § 8, 122 Stat. 3553, 3559. Prior to the enactment of the ADAA, courts in their assessment of "disability" had relied on the standard the Supreme Court articulated in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

Under *Toyota*, an employee seeking protection under the ADA had to demonstrate, as a threshold matter, that he or she suffered from a "disability" by showing: (1) that he or she had a major, long-term physical or mental impairment and (2) that the impairment severely restricted the employee from performing a major life activity that an average person in the general population could perform. 534 U.S. at 194–95, 122 S.Ct. 681; *Faiola v. APCO Graphics, Inc.*, 629 F.3d 43, 47–48 (1st Cir.2010).

The ADAA appears to have been enacted in response to the *Toyota* decision, and to the Supreme Court's holding in *Sutton v. United Air Lines*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Pub.L. No. 100–325, § 2, 122 Stat. 3553, 3554. Under the ADAA, the Equal Employment Opportunity Commission ("EEOC") has promulgated regulations that, to some extent, were designed to make it easier for a plaintiff to demonstrate the existence of a disability. A disability, however, is still defined as "a physical or mental impairment that sub-

stantially limits one or more ... major life activities." 29 C.F.R. § 1630.2(g)(1)(i). The regulations also still make it clear that "not every impairment will constitute a disability within the meaning of this section." *Id.* at § 1630.2(j)(1)(ii). Now, however, an impairment does not need to "prevent, or significantly or severely restrict a person from performing a major life activity in order to be considered substantially limiting." *Id.* The ADAA amendments were "intended to provide for more generous coverage" and application of the ADA in a way that is "predictable, consistent, and workable...." *Id.* at § 1630.2(j)(3)(i).

■ It is well established that the ADAA was effective only as of January 1, 2009 and is not retroactive. *Thornton v. United Parcel Serv. Inc.*, 587 F.3d 27, 34 n. 3 (1st Cir.2009). The facts are undisputed that Plaintiff's request for accommodation was rejected and his position at Nationwide was terminated by December 31, 2008. Nevertheless, Plaintiff argues that the new, more generous standard as set forth in the ADAA should apply to this case because Plaintiff's employment with Nationwide itself did not formally end until January 31, 2009, thirty days after the Act's provisions became effective. The argument is not persuasive.

The First Circuit in *Thornton* cited with approval the Sixth Circuit's decision in *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562 (6th Cir.2009), for the proposition that the ADAA "does not apply retroactively to govern *conduct* occurring before the Act became effective." 587 F.3d at 34, n. 3 (emphasis added) (quoting *Milholland*, 569 F.3d at 565). Here, the conduct at issue was plainly Defendant's denial of Plaintiff's request for accommodation and its decision to terminate him

from his position based on his failure to pass the Series 65 exam. The fact that Plaintiff was given a provisional opportunity to apply (as it turned out, unsuccessfully) for some other slot in the company over the next thirty days, up to January 31, 2009, cannot obscure the fact that the discriminatory *conduct* had occurred as of December 31, 2008.

■ This construction of the application of the ADAA is consistent with case law construing when a cause of action under the ADA accrues. The determinative date may be when the notice of termination is given, as in *Martin v. Sw. Va. Gas Co.*, 135 F.3d 307, 309 (4th Cir.1998). Or it may be "when the refusal to accommodate first occurs." *EEOC v. United Airlines*, No. C06–1407Z, 2009 WL 5197825 at *2–3 (W.D.Wash. Dec. 22, 2009) (citing *Taylor v. AutoAlliance Int'l, Inc.*, No. 08–cv–11318, 2009 WL 2591533 at *4 (E.D.Mich. Aug. 24, 2009)); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551–52 (7th Cir.1996); *Hinch v. Duncan*, 941 F.Supp. 62, 65 (W.D.Va.1996).[2]

Having addressed the preliminary issue of the applicable standard for determining disability, it is now time to step back and look at the broader framework.

**B.  *The McDonnell Douglas Framework.***

Without direct evidence of employment discrimination, the court's analysis of Defendant's motion for summary judgment must follow the familiar three-step process set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ At the first step, Plaintiff bears the threshold burden of establishing a *prima facie* case of ADA disability discrimi-

---

**2.**  As will be seen, the more generous standard would not save Plaintiff. The record will not support a finding of disability under either standard.

nation. In order to make out a *prima facie* case in the summary judgment context, Plaintiff must point to sufficient evidence in the record to establish (1) that he or she suffered from a disability, (2) that he or she was able to perform the essential functions of the job despite this disability, with or without a reasonable accommodation, and (3) that the defendant terminated the employee based in whole or in part on this disability. *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir.2005). Where the employee asserts a failure to offer a reasonable accommodation as the basis for the discrimination claim, as Plaintiff does here, the employee must point to evidence of record to support a favorable finding on the first two prongs and then establish that the employer knew of the disability but refused, upon request, to offer a reasonable accommodation that would have permitted the employee to do the job. *Faiola*, 629 F.3d at 47.

■ If Plaintiff is able to make out a *prima facie* case, at the second stage the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its decision to terminate Plaintiff. If Defendant is able to offer credible evidence of the genuineness of its legitimate reason, then the burden shifts back to Plaintiff to demonstrate that this supposed justification is a cloak for discrimination. *Tobin*, at 105.

As will be seen below, the record, viewed in the light most favorable to Plaintiff, is simply insufficient to make out even a *prima facie* case.

### C. *Disability.*

Under the pre–2009 rubric, the ADA imposed a "demanding standard" for making a *prima facie* showing that an individual had a qualified disability. *Toyota*, 534 U.S. at 197, 122 S.Ct. 681. As noted earlier, the standard had two elements.

First, an individual had to show that he suffered from a physical or mental impairment. *Id.* at 194, 122 S.Ct. 681. Next, an individual seeking accommodation had to demonstrate that this physical or mental impairment severely restricted a major life activity. *Id.* at 195, 122 S.Ct. 681. As the Supreme Court noted:

> an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term.

*Id.* at 198, 122 S.Ct. 681. Major life activities could include functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *See* 45 C.F.R. § 84.3(j)(2)(ii) (2005).

■ To satisfy the first criterion, a physical or mental impairment, Plaintiff identified his brachial plexus palsy, which "limited his use of his left arm for manual purposes." (Dkt. No. 47, Def.'s Mot. in Opp'n at 14.) Plaintiff, however, nowhere suggests that this physical impairment interfered in any way with his ability to do his job, or his ability to take the Series 65 exam. His job demanded no particular physical dexterity, and in any event he performed it very successfully, by his own testimony. Moreover, there is no suggestion that Plaintiff inability to pass the exam arose from any problem with the physical use of his left arm.

Beyond the explicit claim that his brachial plexus palsy constituted a qualifying "disability" for purposes of this litigation, Plaintiff's identification of any other basis for a disability finding is vague. Hints are offered that Plaintiff's "recent medical condition and resulting treatment" undermined his ability to pass the test. (*Id.* at 7.) Nowhere, however, does Plaintiff argue

that his mental functioning was compromised as a result of his medical condition, to the point where some activity identified under the regulations, such as learning or working, was impaired sufficiently to constitute a cognizable disability.

Indeed, the record renders this potential argument an impossibility. Throughout the time he was attempting to take the exam, except for the period when he was actually undergoing and recovering from surgery, Plaintiff was working extremely competently. His problem was not that his disability rendered him unable to work in general, or even that it rendered him unable to perform the typical functions of his specific job. His problem, so far as the record reflects, was solely that he could not pass the Series 65 exam.

The record is, if anything, even more glaring in its deficiency with regard to the second criterion. In order to make out a *prima facie* case, Plaintiff must point to evidence sufficient to convince a jury that his impairment was permanent or at least long-term, and that it severely restricted a major life activity. Plaintiff bears the burden of offering evidence that the extent of the limitation caused by his impairment was substantial. *Toyota,* 534 U.S. at 198, 122 S.Ct. 681. Even if the record were sufficient, preliminarily, to provide evidence of an impairment, it falls far short of showing, even when viewed generously, any long-term, substantial restriction of a major life activity.

No medical evidence supports Plaintiff; what evidence exists undermines his claim. He was, as noted above, sent back to work after surgery, months before he requested additional time to re-take the FINRA examination, with no restrictions from his treating physician. No doubt Plaintiff is entirely correct that for some time after his surgery, and even prior to the surgery, his arm hurt and restricted him from performing manual tasks. (Dkt. No. 47, Ex. 2.) His own contemporary comments, however, offer no support for a claim of substantial impairment. Indeed, his own words describe a routine, post-surgical situation where an employee is on the mend. After his shoulder surgery in 2008, for example, Plaintiff wrote to his supervisor's secretary to tell her that he was "feeling much better" and that "the worst was behind" him. (Dkt. No. 34, Ex. F, Jones Dep. 145:12–16.)

As noted above, Plaintiff does not appear to argue that he suffered some cognitive deficit, as a result perhaps of taking painkillers, that restricted him in a major life activity of daily living. Plaintiff reported in his deposition that his general performance at work was *not* affected by his medical condition in December 2008, at the time he requested additional time to take the FINRA test. (Dkt. No. 47, Ex. 1, Jones Dep. 82:23–24–83:1–4.) Moreover, while it is true that his lack of success on the Series 65 exam sometimes occurred while he was taking painkillers, it is also true that he failed the exam *before* he started taking the drugs. In short, Plaintiff has put no evidence before the court— through expert medical testimony or even through his own reports—to demonstrate that he was severely restricted (apart from the time immediately surrounding his surgery) in any major life activity. Certainly, as of December 2008, when he first formally requested an accommodation, the record can support no inference that he suffered any such disabling condition.

The facts regarding the claim of disability in this case present a pattern very similar to *Faiola v. APCO Graphics, Inc.,* 629 F.3d 43 (1st Cir.2010). In that case, the plaintiff contended that the prospect of traveling by airplane and attending a particular sales conference generated such a degree of stress that it impaired her abili-

ty to "work" and thus affected a major life activity. Judge Stahl noted that in order to demonstrate a substantial limitation as to work, the plaintiff had to demonstrate an inability to perform a class of jobs and not simply a particular job. *Id.* at 48. The court noted that plaintiff was performing her job very well in general, and the particular problem plaintiff was experiencing in one aspect of her job was insufficient to demonstrate a limitation of the "major life activity" of working. Moreover, as here, Plaintiff failed to offer any medical evidence of disability and relied purely on her own say-so. On the question of disability, this case is effectively on all fours with *Faiola*.

### D. *Reasonable Accommodation.*

As *Tobin* teaches, a *prima facie* case cannot be made out simply by showing that Plaintiff suffered from a sufficiently disabling, long-term impairment; he must also show that he could perform his job with or without an appropriate accommodation. 433 F.3d at 104. If a reasonable accommodation might have allowed Plaintiff to do his job, he must show that his employer refused to offer him this accommodation. *Toyota,* 534 U.S. at 193, 122 S.Ct. 681.

In this case, Plaintiff's requested accommodation—more time to take the test—was not reasonable, for two reasons.

First, Defendant had already offered Plaintiff several opportunities over several months to take the exam, and he had failed to pass. This was not a situation where Defendant closed down further opportunities after one, two, or even three attempts. It may perhaps have been kindhearted to allow Plaintiff one more try, but, as a matter of law, it was not *unreasonable* for Defendant to decide, in effect, that enough was enough at the point it did.

Second, the possibility that Plaintiff would have passed the exam with another try is entirely speculative. "One element in the reasonableness equation is the likelihood of success." *Evans v. Fed. Exp. Corp.,* 133 F.3d 137, 140 (1st Cir.1998) (interpreting Mass. Gen. Laws ch. 151B). As noted, Defendant had already given Plaintiff numerous opportunities to pass the test and obtain the new mandatory credential. Plaintiff, when he requested yet more time, was still taking pain medication and still suffered brachial plexus palsy. Nothing had changed. No accommodation was requested other than another try. Under the circumstances, it was not, as a matter of law, *unreasonable* for Defendant to conclude that a further effort would be futile.

As noted above at footnote 2, even if the court were applying the arguably more generous standard set forth in the amendments to the ADA, the result would be the same. The regulations applicable after January 1, 2009 still state that, to constitute a disability, a physical or mental impairment "must substantially" limit "one or more ... major life activities." 29 C.F.R. § 1630.2(g)(1)(i). Moreover, "not every impairment will constitute a disability within the meaning of this section." *Id.* § 1630.2(j)(1)(ii).

It is true that, under current regulations, an impairment need not actually "prevent, or significantly or severely restrict a person from performing a major life activity in order to be considered substantially limiting." *Id.* The new regulations also recognize that, under certain circumstances, the impact of medication may sufficiently impair an employee to constitute a disability. *Id.* § 1630.2(j)(4)(ii) ("[T]he non-ameliorative effects of mitigating measures such as negative side effects of medication ... may be considered when determining whether an

individual's impairment substantially limits a major life activity.") The requirement remains, however, that the impairment must have some substantially limiting impact on a major life activity. On the facts of record, no jury could make that finding. To repeat, the impairment of Plaintiff's physical dexterity bore no relevant connection to the performance of his job. Non-physical deficits, to the extent they existed and have been identified, had no impact on any major life activity.

In light of the foregoing, it is not necessary to push the discussion further. Defendant's contention that providing more time to take the test would have resulted in an undue burden on Defendant, that obtaining the Series 65 license was an essential function of the job, and that Plaintiff did not request the reasonable accommodation soon enough all have force. However, the inability of the record to support Plaintiff's claim of disability, or to undercut the reasonableness in Defendant's decision not to offer the requested accommodation, make additional analysis unnecessary.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 31) is hereby ALLOWED. As noted, for the record, Plaintiff's motion to amend (Dkt. No. 52) is also ALLOWED. The clerk will enter judgment for Defendants. This case may now be closed.

It is So Ordered.