# United States Court of Appeals
## For the First Circuit

No. 12-1414

MARK JONES,

Plaintiff, Appellant,

v.

NATIONWIDE LIFE INSURANCE COMPANY;
NATIONWIDE RETIREMENT SOLUTIONS, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Thompson, Circuit Judges.

Maurice M. Cahillane, with whom Egan, Flanagan and Cohen, P.C.
was on brief, for appellant.
Jessica L. Herbster, with whom Sara Goldsmith Schwartz and
Schwartz Hannum PC were on brief, for appellees.

September 26, 2012

**LYNCH**, <u>**Chief Judge**</u>. After Mark Jones repeatedly failed to pass an examination to receive a license required by his employer of all persons in that position, by a date of which he had many months' notice, he requested for the first time that the date be extended due to his medical condition. When his employer declined, and Jones declined to pursue an open alternate position at lesser pay, his employment ended on January 31, 2009. He then sued under both federal and state disability laws. <u>See</u> 42 U.S.C. § 12101 <u>et seq.</u>; Mass. Gen. Laws ch. 151B, § 1 <u>et seq.</u> The district court entered summary judgment for the employer. <u>Jones</u> v. <u>Nationwide Life Ins. Co.</u>, 847 F. Supp. 2d 218, 220 (D. Mass. 2012). We affirm, bypassing the question of whether Jones met the definition of "disability" and holding that the reasonable accommodation provisions of both statutes do not save his case.

I.

A.        <u>Undisputed Factual Background</u>

In an appeal from a grant of summary judgment, we review the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his favor. <u>Mulero-Rodríguez</u> v. <u>Ponte, Inc.</u>, 98 F.3d 670, 672 (1st Cir. 1996).

Jones has worked in the insurance industry since 1984. In 1998, his company became Nationwide Retirement Solutions Insurance Agency, Inc. ("NRSIA"), which, as relevant to this

appeal, became defendant Nationwide Life Insurance Company ("NLI") in 2001.[1]

At NLI, Jones in 2001 became a Retirement Program Services Director, a managerial and supervisory position. His tasks included increasing the number of clients in his region, maintaining client relationships, and supervising and coaching the Retirement Specialists who worked under him. The Retirement Specialists met with employees participating in deferred compensation plans to explain NRS's retirement programs and to offer products and services. As of December 2008, Jones was supervising seven Retirement Specialists, and he was ultimately responsible for ensuring that they were successful. During the relevant time period, Jones reported to Brenda Anderson, one of

---

[1]   In the transition to NRSIA, Jones officially became an employee of Nationwide Retirement Solutions, Inc. ("NRS"), the other defendant named in this appeal. In 2001, NRS ceased having payroll and employment functions, and all employees of that affiliate were transferred to NLI. NRS continued to provide the products and services that NLI employees sold.
During the time relevant to this appeal, Jones was employed by NLI. NLI and NRS argued before the district court that NRS should be dismissed as a party because it was not the employer during the relevant time period and Jones had not articulated any separate theory of NRS's liability. Jones did not address this argument in his opposition to summary judgment. In its memorandum and order granting summary judgment, the district court stated in a footnote that the Nationwide affiliates other than NLI "have been dismissed." Jones v. Nationwide Life Ins. Co., 847 F. Supp. 2d 218, 220 n.1 (D. Mass. 2012). However, the district court docket indicates that NRS was never formally dismissed. NRS thus remains a party to this appeal. We will treat the district court's order as having granted summary judgment to NRS for the same reasons as those applicable to NLI.

NLI's Regional Vice Presidents. Anderson, in turn, reported to Stephen Angelis, the Vice President of Sales.

In 1979, Jones was involved in a motorcycle accident, and as a result he developed brachial plexus palsy ("BPP"). This condition causes chronic pain in Jones's left arm and has caused him to lose most of his use of that arm, resulting in atrophy that has made his left arm smaller than his right. He has since regularly taken painkillers to manage his condition.

In February 2006, Jones fell and broke his left shoulder. Jones already had a fused left shoulder held together by metal plates, so it was difficult to treat his new injury. He underwent four surgeries during 2006. Jones's doctor prescribed both morphine and oxycodone to manage the pain. During 2007 and 2008, Jones developed an infection relating to his 2006 surgeries, and in June 2008 he had another operation to treat the infection and remove hardware from a previous surgery.

Jones continued working full time through these events, except for approximately nine weeks of approved medical leave surrounding his various surgeries. His physician's letter dated August 27, 2008, sent to NLI's Associate Health Services Department, stated that as of July 28, 2008, Jones was medically cleared to return to work from his final surgery, with no restrictions. At no time before December 24, 2008, did Jones claim to be disabled or to require an accommodation to do his job.

-4-

On February 20, 2006, Jones had received an e-mail informing him that in mid-2006, NRS would begin to offer a new retirement product called the NRS Managed Account Service, which the parties refer to as "ProAccount." The e-mail stated that relevant employees would have to become an Investment Advisor Representative ("IAR") of Nationwide Investment Services Corporation ("NISC") in order to sell and service ProAccount. To obtain the IAR certification required the employee to pass the Series 65 or 66 licensing exam, a test administered by the Financial Industry Regulatory Authority ("FINRA"). FINRA offers "windows" during which the exams are available and controls the intervals that a test-taker must wait between exams if he does not pass. After the first and second failures, the waiting period is thirty days; after the third and later failures it increases to 180 days. Because of the FINRA licenses he already held, Jones was eligible to take the Series 65 exam. Jones had taken and failed the Series 65 exam once in 1999, but that was unrelated to the ProAccount product.

Jones knew that passing the Series 65 exam would be a job requirement. There is some uncertainty as to whether the February 20, 2006 e-mail conveyed that requirement.[2] Jones claims that he

_____

[2] The job description for Jones's position indicated that a Series 65 license "may" be required. The February 2006 e-mail notified Jones that passing the exam would be required to offer ProAccount to clients, but it did not explicitly state that passing the exam was a job requirement. The February 2006 e-mail did

-5-

did not learn of the requirement until December 2007, yet this is clearly incorrect; on March 3, 2006, Jones received an e-mail from Kathleen Nader, one of the company's compliance officers, which stated: "Because you have been identified as someone who will be working with [ProAccount,] you are required to become registered as an [IAR]."

The March 3, 2006 e-mail also noted that under NISC policy, employees have 120 days to pass the exam from the date that their first window opens. Attached to this e-mail was a copy of the IAR registration policy and an acknowledgment form. Recipients were asked to return the signed acknowledgment form within ten days. This e-mail was sent to over 40 employees who worked with managed accounts.

Nonetheless, Jones did not return his form until May 11, 2006, a delay which, in turn, delayed his eligibility to take the exam. In 2006, NLI's Series 65 window was open from April 13 through August 17. Jones was first eligible to take the exam on May 12, 2006. Jones did not take the Series 65 exam at any point in 2006.

NRS began offering the ProAccount product to customers in Jones's region in the spring of 2007. On February 16, 2007, Jones

---

contain information about the upcoming testing window, offer instructions about how to prepare for the test, and urge recipients to begin studying immediately and to schedule an exam as soon as possible once the window opened.

received an e-mail informing him that a testing window would be open from February 17 through June 17. Jones did not schedule a testing date until late in the window, on June 15, 2007, and he did not sign up for a preparatory class. Jones failed the exam he took on June 15, 2007.

On December 4, 2007, Angelis, the Vice President of Sales, e-mailed all sales personnel, including Jones, to inform them that, effective January 1, 2008, passing the Series 65 or 66 exam by the end of that year would be a condition of employment in the regions where ProAccount was offered. Employees had until December 31, 2008 to pass the exam, or they would face transfer or termination. This requirement was uniformly applied to existing employees.

The following day, Anderson e-mailed Jones and reminded him that "this will be critical to pass when your window opens. Please begin studying now to work toward a successful completion." Thus, Jones, at the very least, had clear notice that passing the exam was a function of his job for over twenty-one months, and over twelve months' notice that if he did not pass it could cost him his job.

The next testing window opened on January 3, 2008. But Jones did not take the exam until late February. Again, he failed

to take a preparatory class for this exam.  Jones took and failed the exam for a second time on February 27, 2008.[3]

Jones did not take a preparatory class until after this second failure, and even then, he missed one day of the two-day class.  Anderson also encouraged Jones to take time off to study before his third exam sitting.

Jones was next eligible to take the exam on March 28, 2008, and his window was open until May 2, 2008.  He did not take the exam again until April 30, 2008, over a month after he took the preparatory class.  Jones failed the April 30 exam.  Because the April 30 test was Jones's third failure, he had to wait at least 180 days to take the test again.  This meant that he would have only one more chance to take the exam before the deadline on December 31, 2008.

By this time, Jones was the only Program Director who had not passed the Series 65 exam, and all of the Retirement Specialists who worked under Jones had also passed.  Because Jones did not have the license, Anderson had to step into Jones's role to supervise ProAccount duties for the Retirement Specialists on his team.  Anderson had to spend additional time overseeing Jones's team members and reporting back to NLI's home office with regard to

---

[3] Technically, this was the third time that Jones failed the exam, counting his failure in 1999.  However, for the purpose of his waiting periods, the February 2008 test counted as only the second failure, since it was the second one after NLI began opening windows related to ProAccount certification in 2006.

ProAccount sales. She also had to take responsibility for managing ProAccount items in NLI's compliance database. Further, Jones was only permitted to talk to clients in general terms about ProAccount and could not be involved in sales of the product, so Anderson also had to take on some of Jones's client communication duties. Jones could not assist his Retirement Specialists when they made in-person ProAccount sales, a task that was normally part of a Program Director's training duties. In May 2008, Anderson reported to Angelis that she had empowered Paul Bertrand, a senior Retirement Specialist on Jones's team, to coach other team members on ProAccount, though Bertrand could not recall whether he had done so. Jones's 2007 performance evaluation stated that his team was unable to operate at full capacity with regard to ProAccount sales because the team was not fully Series 65 licensed.

After Jones returned from medical leave following his June 2008 surgery, Anderson, on her own initiative, asked the human resources department whether the medical leave Jones had taken in June and July 2008 would require an extension of Jones's Series 65 testing window. She was told that it would not, because Jones had already had multiple windows and testing opportunities before the surgery. Anderson did not inquire further about Jones's medical condition because she understood that information to be confidential. At no time before December 24, 2008, did Jones say

anything to Anderson about his medical condition affecting his ability to take and pass the Series 65 exam.

Jones's final testing window opened on October 29, 2008. He had an opportunity to take another preparatory class, but he testified that he did not recall doing so. Jones again waited for almost two months before taking the exam for a fourth time on December 23, 2008. He again failed.

That same day, Jones called Anderson to inform her that he had failed the exam. In this conversation, he did not ask for any extension of time to take the exam again. Anderson then notified Angelis.

On December 24, Anderson spoke to Jones again and reiterated the company's policy about the necessity of obtaining a Series 65 license. In this phone call, Jones mentioned for the first time that he thought his medical condition had affected his ability to pass the exam. Also for the first time, he raised the possibility of being granted more time to pass given his medical condition over the past year. Anderson told Jones that NLI had given him "plenty of opportunity" to pass and that they would need to be "equitable" when December 31 arrived. She also stated that NLI might be able to offer him a position in Maryland as a Retirement Specialist because that position did not require a Series 65 license.

Facing a December 31 expiration date for his period to have obtained a Series 65 license, Jones e-mailed Angelis on December 28, 2008, and, for the first time, specifically requested an extension of time to complete the Series 65 requirement. He told Angelis that his "recent medical condition and resulting treatment impacted me more than I would care to admit." Jones stated that his 2006 injury and its "aggressive treatment," including high doses of morphine and oxycodone, had "drastically hindered [his] academic ability" by making him unable to concentrate on the exam material. He did not submit any information from his medical providers in support of these assertions.

Jones's e-mail also assured Angelis that his "health [was] improving overall and positive changes in [his] pain management treatment have been favorable." Angelis responded by telling Jones he would discuss the matter with Anderson and other members of the senior leadership team.

Shortly thereafter, Angelis held a conference call with Anderson and other team members in which they discussed Jones's extension request. The group considered whether the unsupported assertions about his medical condition that Jones had provided in his e-mail supported his request for an extension, and they determined that it did not. On December 31, 2008, Anderson called Jones and informed him that he would not be granted an extension.

She told him that the decision to apply the original deadline would stand because it was a consistent policy across the company. Anderson again offered to assist him in finding another position within the company.

Anderson memorialized this December 31 conversation in a letter to Jones dated January 5, 2009, which stated:

> This is to provide a formal notification of our discussion last week. As previously communicated, a Series 65 license is required for your position. Since you did not obtain this license by the December 31, 2008 deadline, you are no longer eligible to remain in the Standard Plans Program Director position.

The letter also stated that Jones would be terminated on January 31, 2009 if he did not find another position within NLI.[4] Jones chose not to pursue the position in Maryland because it offered a significantly lower salary and would require him to relocate. He interviewed for, but did not get, a position in Connecticut. Jones was unable to secure another position by January 31, 2009, and his employment was terminated.

On January 20, 2009, Jones's oxycodone prescription was increased from ten to fifteen milligrams. As of June 2011, Jones continued to take fifteen milligrams of oxycodone and sixty milligrams of morphine.

---

[4] Of the six other NLI employees who had not met the Series 65 requirement by the December 31, 2008 deadline, three were terminated and three were transferred to other positions that did not require the Series 65 license.

Because of the six-month waiting period to retake the exam after more than two failures, Jones would not have been eligible to take the Series 65 exam again until June 23, 2009 -- almost five months after his termination date.

B.    Procedural Background

On October 7, 2010, Jones filed a complaint in Massachusetts Superior Court, alleging that NLI, NRS, and NRSIA had discriminated against him on the basis of handicap, failed to reasonably accommodate his handicap, and failed to engage in an interactive process regarding accommodation, all in violation of Mass. Gen. Laws ch. 151B, §§ 4, 9.  The defendants removed the case to the District of Massachusetts on the grounds of diversity on November 15, 2010.  At the same time, the defendants moved to dismiss NRSIA as a defendant.  Jones did not object to the motion, and NRSIA was dismissed on January 24, 2010.  Jones then amended his complaint against NLI and NRS on February 17, 2011, to add a cause of action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.

After discovery, on November 10, 2011, the defendants moved for summary judgment.  The district court held a hearing on December 14, 2011.  On March 5, 2012, the district court issued a memorandum and order granting defendants' motion.  Jones, 847 F. Supp. 2d at 220.  The court concluded that Jones had failed to make out a prima facie case of disability discrimination because he

-13-

could not demonstrate that he suffered from a disability under either federal or Massachusetts law, id., or that the accommodation he requested was reasonable, id. at 226.  Jones timely appealed this decision on March 28, 2012.

## II.

We review a district court's grant of summary judgment de novo.  Roman v. Potter, 604 F.3d 34, 38 (1st Cir. 2010).  We will uphold summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We may affirm summary judgment "on any basis apparent in the record."  Chiang v. Verizon New Eng. Inc., 595 F.3d 26, 34 (1st Cir. 2010).

We analyze claims under the ADA and under Massachusetts General Laws chapter 151B using the same framework.  Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 33 n.2 (1st Cir. 2000).  At times the two schemes may vary, but that is not at issue here.

Under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff in a disability discrimination case must first make out a three-factor prima facie case.  Ordinarily, the plaintiff must show that he (1) is disabled within the meaning of the ADA;[5] (2) is qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was

---

[5] The statutory definitions of "disability" under the ADA and "handicap" under chapter 151B are "essentially the same."  Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 n.2 (1st Cir. 2010).

-14-

discharged or otherwise adversely affected in whole or in part because of his disability. See Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 74 (1st Cir. 2010); García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000). We describe later the requirement for a plaintiff to show a failure to make a reasonable accommodation.

Jones raises several challenges to the district court's application of this standard. While Jones attacks the conclusion that he was not disabled, we bypass that issue and turn to the "qualified individual" and "reasonable accommodation" prongs. We also bypass the question of whether the standards of the ADA Amendments Act of 2008, which affect the definition of "disability," apply here.[6] Under either standard, the claim fails.

---

[6] Under the ADA, in order to establish that he is disabled, a plaintiff must show that he has a "physical or mental impairment that substantially limits" a major life activity. 42 U.S.C. § 12102(1)(A). In 2002, the Supreme Court interpreted this language strictly. See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002). The ADA Amendments Act of 2008 ("ADAAA"), Pub L. No. 110-325, 122 Stat. 3553, however, rejected this strict standard and instructed that "disability" should be "construed in favor of broad coverage." Id. § 4(a) (codified at 42 U.S.C. § 12102(4)(A)). The ADAAA was enacted on September 25, 2008, and became effective on January 1, 2009.
    The district court found that the ADAAA did not apply to Jones's claims because the relevant conduct took place before January 1, 2009, and the ADAAA does not apply retroactively to conduct occurring before its effective date. Jones, 847 F. Supp. 2d at 223 (citing Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 34 n.3 (1st Cir. 2009)). Jones, on the other hand, argues that relevant conduct did occur after January 1, 2009, and further that the ADAAA should apply retroactively to conduct taking place between the enactment date and the effective date.
    The district court then concluded that, while Jones had

-15-

As to the "qualified individual" element of his prima facie case, Jones argues that the district court erred in implicitly finding that obtaining a Series 65 license was an essential function of Jones's job.[7]  He then argues that, even if it was an essential function, he could have performed it with the reasonable accommodation of an extension of time, and the district court erred in finding his proposal unreasonable as a matter of law.  We reject both arguments.

_____

established that he suffered a physical impairment, this impairment did not severely restrict his ability to perform the major life activity of working.  Id. at 224-25.  It also found that Jones had not -- and could not have -- argued that he suffered from a mental disability that severely restricted him from working, considering that he continued to perform all functions of his job other than passing the Series 65 exam even while he was injured and taking painkillers.  Id.  This analysis would hold, the court noted, even under the more generous ADAAA standard.  Id. at 223 n.2, 226.

Jones argues that the court misinterpreted the disability standard.  He asserts that his BPP is a disability because it severely impairs all of the major life activities that require use of his left arm, and it did not have to impair the activity of working to be considered a disability.  Further, he argues that concentration and memory impairment were another limitation caused by this disability, since these were the effects of heavy doses of pain medication that would not have been necessary were it not for his underlying condition.  The evidence that he could perform his job despite his impairment goes to the "qualification" element, Jones submits, not the "disability" element.

We need not resolve these arguments in order to resolve Jones's appeal.  For the purposes of this decision, we will assume that Jones was disabled under either the Toyota or the ADAAA formulation.  Such an assumption does not change the outcome, because in any event Jones's claims falter on the second prong of the prima facie case.

[7] The district court's analysis did not specifically address the essential functions issue, but it appears to have assumed that passing the exam was essential in proceeding to its analysis of whether Jones's requested accommodation was reasonable.

-16-

While we agree with Jones that several of the "facts" stated in the district court's opinion are mistaken, none of those facts is material to our analysis.

A.        "Qualified Individual"

"The 'qualified individual' criterion and the 'reasonable accommodation' requirement are interrelated."  H. Perritt, Jr., Americans With Disabilities Act Handbook § 4.18, at 124 (3d ed. 1997).  "Being qualified is determined in relation to the essential functions of the job, and reasonable accommodation by the employer does not require the elimination of an essential function of the job."  Id. (footnote omitted).

An essential function is a "fundamental job duty of the position at issue.  The term does not include 'marginal' tasks, but may encompass 'individual or idiosyncratic characteristics' of the job."  Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001) (citations omitted) (quoting Ward, 209 F.3d at 34).  Factors to be considered include the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the current work experience of incumbents in similar jobs.  Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (citing 29 C.F.R. § 1630.2(n)(3)).  The court gives a "significant degree" of deference to an employer's business judgment about the necessities of a job.  Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012).

The employer, NLI, indisputably characterized passing the Series 65 exam as an essential function of the job of Program Director in Jones's region. As early as March 2006, and certainly no later than December 2007, NLI conveyed to Jones and others that the Series 65 license was a job requirement with the introduction of ProAccount. In particular, the December 2007 e-mail from Angelis explicitly stated that a Series 65 license would be a condition of employment and that failure to pass the exam by the end of 2008 could result in termination. Jones's direct superior also repeatedly emphasized to him the importance of passing the Series 65 exam. The Program Director job description stated that a Series 65 license could be required for the job. By October 2008, all of NLI's Program Directors in regions offering ProAccount had obtained Series 65 licenses, except for Jones.

Jones makes much of the fact that the person NLI hired to replace him did not have a Series 65 license when he was hired. But that does not show that having the license was not an essential function of the job. To the contrary, Jones's replacement was required to obtain the license, and he did in fact obtain it on June 22, 2009, less than six months after he was hired and within his first testing window. Since Jones was ineligible, due to his previous failures, to take the exam again until June 23, 2009, his successor in fact passed the exam before Jones possibly could have.

-18-

We reject Jones's argument that because his team showed strong ProAccount sales even when Jones lacked the license, that means the license requirement was not an essential function. In the essential functions inquiry, "[t]he fact that certain tasks associated with a particular position can be either reduced, reassigned, or reallocated . . . does not, by itself, render them non-essential to the position they were associated to in the first place." Walgreen Co., 679 F.3d at 17. As a practical matter, Jones himself admitted that because he had not passed the exam, Anderson was forced to perform certain functions of Jones's job with regard to ProAccount. This reinforces that obtaining the license was an essential function.

B.        "Reasonable Accommodation"

Where a plaintiff alleges a failure to accommodate, the plaintiff must show that the employer knew about plaintiff's disability and did not reasonably accommodate it. See Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007); Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003). Jones attacks the district court's conclusion that he did not meet his burden of showing that his purported accommodation request was reasonable. He argues that he could have performed the essential function of passing the Series 65 exam with the reasonable accommodation of an extension of time, and also that it was error for the district court to conclude that such an accommodation was

-19-

unreasonable because it would have been futile.  See Jones, 847 F. Supp. 2d at 226.

A plaintiff must explicitly request an accommodation, unless the employer otherwise knew one was needed.  Freadman, 484 F.3d at 102.  An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability.  Id.; see also Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 129 (1st Cir. 2009).  The obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation.  B. Lindemann & P. Grossman, Employment Discrimination Law ch. 5.III, at 269 (4th ed. 2007) (citing 29 C.F.R. § 1630.2(o) app. (2005)).  This means not only notice of a condition, but of a "causal connection between the major life activity that is limited and the accommodation sought." Id. ch. 13.VI.D.1, at 880 (quoting Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 687 (8th Cir. 2003)) (internal quotation mark omitted).

Jones's only purported accommodation request was his Sunday, December 28, 2008, post-Christmas e-mail to Angelis.  While this e-mail was direct and specific in its request for an extension of time, it did not link Jones's request to his now-claimed disability.  His briefing asserts that BPP was his disability.  The e-mail states that Jones underwent multiple surgeries and aggressive pain management treatment.  It does not mention BPP or

-20-

suggest in any way that Jones's recent medical treatments or pain therapy were connected to BPP.  It does assert that "[t]he seriousness of my medical condition coupled with the aggressive treatment which followed, left me intensely ill, physically, as well as it [sic] drastically hindered my academic ability as I was unable to successfully concentrate on the material during the previous exams."  At the same time, the e-mail says that despite his medical challenges, Jones had performed his job well during the last two years.  Jones did not refer to or attach any medical records or certifications in support of his statements.

NLI executives were not on notice that the symptoms Jones described in his e-mail were caused by a disability.  See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260-62 (1st Cir. 2001) (holding that plaintiff did not adequately request accommodation when she failed to inform superiors that her anger management problems were due to bipolar disorder, because she "never adequately put [the employer] on notice of her disability," id. at 260, and "gave no notice of the aspect of her illness relevant to the accommodation she sought," id. at 262).  The employer was aware that during 2006-2008 Jones had been able to perform all other aspects of his job without any claim of impairment.  Indeed, before the assertions made on December 28, 2008, Jones's doctor had permitted Jones to return to work with no limitations following his June 2008 surgery.  Whatever Jones's evident physical

-21-

characteristics, they had neither been claimed earlier to have been a disability nor been claimed to have required an accommodation.

Beyond that, Jones's requested accommodation was not reasonable. It was Jones's burden to demonstrate that his requested accommodation "seem[ed] reasonable on its face." See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002) (citing Reed, 244 F.3d at 259).

To begin with, the request came too late and after Jones knew his employment was being terminated after his failure to perform an essential function of his job. For two years, he had not had the capacity to handle a product his company was marketing. When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be "too little, too late." Reed, 244 F.3d at 262 n.9; see also Rose v. Laskey, 110 F. App'x 136, 138 (1st Cir. 2004) (per curiam) (finding that plaintiff's presentation of therapist's letter requesting leave of absence after plaintiff threatened supervisor with violence was "untimely" as well as unreasonable); Hill v. Kan. City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1999) (finding accommodation request untimely when employee made request only after committing two rule violations that "she knew would mandate her discharge"); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 17 n.4 (1st Cir. 1997) (noting, in context of ADA retaliation claim, the "danger" of "permit[ting] an

-22-

employee already on notice of performance problems to seek shelter in a belated claim of disability"); cf. Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 465 (4th Cir. 2012) (rejecting medical student's claim that school failed to reasonably accommodate his mental illness, in part because student did not allege that his behavioral problems were "manifestations of a disability" until after disciplinary board had recommended his dismissal); Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 796 & n.3 (1st Cir. 1992) (rejecting medical student's claim that school failed to reasonably accommodate his learning disability, in part because student never requested alternative testing method until he had failed exam three times and faced expulsion).

Second, in order to show that a proposed accommodation is reasonable, a plaintiff must demonstrate that it "would enable [him] to perform the essential functions of [his] job" and would be "feasible for the employer under the circumstances." Tobin, 553 F.3d at 136 (quoting Reed, 244 F.3d at 259) (internal quotation mark omitted). Jones cannot satisfy the first prong of this test because he presented no basis to his employer for his claim that a six-month delay beyond December 31, 2008 (until he was eligible to take the exam again) was reasonable. He also did not show any reason for the employer to conclude he would pass the exam if given yet another opportunity to take it.

"One element in the reasonableness equation is the likelihood of success." Evans v. Fed. Express Corp., 133 F.3d 137, 140 (1st Cir. 1998); see also Halpern, 669 F.3d at 465 ("[T]he indefinite duration and uncertain likelihood of success of [plaintiff]'s proposed accommodation renders it unreasonable."); Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 202 (6th Cir. 2010) (holding proposed accommodation unreasonable where plaintiff failed to show how proposal would allow him to overcome a "key obstacle" to performing an essential function). Thus, in Evans, this court held that an employer was not required to grant the plaintiff a second leave of absence for substance abuse treatment when plaintiff's first round of treatment, for which he had been granted leave, ended in failure. Evans, 133 F.3d at 140.

Jones attempts to distinguish his case from Evans on the ground that Jones had not formally requested any other accommodation before December 28, 2008. This is true, but misses the point. As in Evans, past experience gave NLI no reason to believe that allowing Jones's proposed accommodation would actually lead him to pass the Series 65 exam. NLI had opened four testing windows since the February 2006 e-mail; Jones could have taken the exam six times. He did take it four times, and he failed each time.

The record also shows evidence of later events, which, while not known to the employer at the time, tends to support its

-24-

conclusion. In his December 28 e-mail, Jones represented that his health situation was "improving." In fact, Jones's doctor increased his oxycodone dosage just a month later. As of June 2011, Jones continued to take high doses of prescription pain medication. He later stated in a deposition that he might have sought a delay of up to a year before taking the test again.

Jones did not satisfy his burden of showing facial reasonableness, see Barnett, 535 U.S. at 401-02, and thus we agree with the district court that the defendants were entitled to summary judgment on Jones's claim for failure to accommodate, see Jones, 847 F. Supp. 2d at 226-27.

C.        Interactive Process and Disparate Treatment

Finally, Jones reasserts his claims for failure to engage in an interactive process and for disparate treatment, which the district court did not reach. Both must fail.

Jones's disparate treatment claim fails because he did not establish that he was qualified to perform the essential functions of his job with or without a reasonable accommodation.

Jones also cannot sustain a claim that the employer failed to engage in an interactive process, for a number of reasons. "[A]n employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [his] job with an accommodation." Walgreen Co., 679 F.3d at 19 (quoting DeCaro v. Hasbro, Inc., 580 F.3d 55,

63 (1st Cir. 2009)) (internal quotation marks omitted). It was Jones's burden "to proffer accommodations that were reasonable under the circumstances," id. at 19 n.6, and Jones did not satisfy this burden. Further, liability for failure to engage in an interactive process "depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." Kvorjak, 259 F.3d at 52. Jones did not present evidence to support such a conclusion. Finally, the employer did raise the possibility of offering Jones a transfer to another open position, but Jones declined to pursue that option.

## III.

Judgment for the employer is affirmed.